STATE

v.

**George DERY, Jr.**

No. 87–297–C.A.

Supreme Court of Rhode Island.

July 22, 1988.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Jane M. McSoley, Asst. Attys. Gen., for plaintiff.

Joseph A. Capineri, Capineri & Crowley, Pawtucket, for defendant.

## OPINION

**WEISBERGER, Justice.**

This case comes before us on the cross-appeals of both the state and the defendant from a Superior Court decision on a motion in limine in which the state sought to preclude, and the defendant sought to allow into evidence the admission of the results of a polygraph examination administered to the defendant. We reverse. The facts of the case are as follows.

The defendant, George Dery (Dery), was indicted on two counts of first-degree arson in violation of G.L. 1956 (1981 Reenactment) § 11–4–2. Testimony revealed that shortly after midnight on April 1, 1983, police and firefighters responded to a fire at two adjacent houses on Leslie Avenue in Barrington. Dery lived next door and was present at the scene. Louis Gelfuso, a detective sergeant with the Barrington police department at the time of the fire, testified at a suppression hearing that he had received complaints from firefighters at the scene that Dery was interfering with their efforts to extinguish the fire.

Sergeant Gelfuso testified that he observed Dery pulling one of the firehoses over a chain-link fence while ignoring the firefighters' orders to stop. Sergeant Gelfuso asked Dery to leave the area and informed Officer Allan Young that if Dery did not leave, he would have to be removed. Officer Young testified that although he told Dery several times to stand behind the fire lines, he did not comply. When Officer Young eventually took steps to remove Dery from the fire scene, Dery became physically violent and abusive. Officer Young informed Dery that he was under arrest for disorderly conduct and for obstructing the efforts of the police and firefighters. Before placing him in the police car, Officer Young advised Dery of his *Miranda* rights.

Upon arriving at the Barrington police station, Officer Young again advised Dery of his *Miranda* rights and told him not to say anything. The defendant began to talk about the problems he had experienced with his next-door neighbor regarding his dog and then said to Officers Young and

Steven MacDonald, "I'm glad I burned the f* * * bitch's house down." Officer Mac-Donald then asked Dery whether he had started the fire, and Dery responded, "Yeah, I burned the bitch's house down." Dery was then urged not to say anything further, and Officer MacDonald once again advised him of his rights. Upon complaining about a pain in one of his wrists, Dery was taken to the hospital by Officer Mac-Donald.

Officer MacDonald testified that after arriving at the emergency room, he again informed Dery of his rights and began to question him about the fire. The defendant said that he was angry with his neighbor, admitted to making the inculpatory statements to Officers Young and Mac-Donald, but denied the validity of the statements. He told Officer MacDonald that he had not been aware of the fire until he was awakened by his girlfriend. On cross-examination Officer MacDonald testified that Dery appeared to be under the influence of alcohol while at the hospital.

Upon returning to the police station Sergeant Gelfuso again informed Dery of his rights and asked him if he would like to discuss the inculpatory remarks he had made earlier. Sergeant Gelfuso testified that Dery's behavior and attitude at this time were considerably more calm than earlier in the evening. Although Dery informed Sergeant Gelfuso that he had been drinking that evening, Sergeant Gelfuso was of the opinion that Dery was not under the influence of alcohol while he spoke with him back at the police station. Sergeant Gelfuso testified that Dery had told him that the person who had called the police about Dery's dog had gotten what she deserved.

On cross-examination Sergeant Gelfuso testified that prior to being taken to the hospital, Dery was very agitated and argumentative and had the smell of alcohol on his breath. He also stated that he had not formed an opinion at that time concerning whether Dery was intoxicated. Sergeant Gelfuso also said that Dery told him he had

not meant the statements that he had made to Officers Young and MacDonald and that he made them only because he was angry.

At the conclusion of testimony at the suppression hearing, the trial justice ruled that the initial statement made by Dery, "I'm glad I burned the f* * * bitch's house down," was admissible as a gratuitous inculpatory statement. The trial justice further ruled that all subsequent statements made by Dery, including his affirmative reply to Officer MacDonald's question concerning whether Dery had started the fire, were to be suppressed since there was no evidence that Dery had affirmatively waived his *Miranda* rights.[1]

In addition to the motion to suppress the statements made by Dery, the trial justice also heard the state's motion in limine to preclude the defense from introducing into evidence any and all references concerning a polygraph examination administered to Dery.

Shortly after the incident in question, Dery contacted Everett Armour, who administered a polygraph examination to Dery. Mr. Armour is a former detective lieutenant with the Rhode Island State Police and a certified polygraphist. The test revealed, in Mr. Armour's opinion, that Dery was telling the truth when he stated in response to a direct question that he did not start the fire.

Mr. Armour, testifying on behalf of Dery, stated that he had administered thousands of polygraph examinations involving criminal investigations. Mr. Armour testified as well regarding his qualifications, his training, the machine used in a polygraph examination, how the machine was in fact used, the pretesting procedures employed, and the bodily responses that are detected by a polygraph machine. Mr. Armour testified to his belief that the accuracy rate of polygraph testing to be between 85 and 95 percent, based upon studies he has read as well as his own experiences in conducting polygraph examinations.

1. The correctness of the trial justice's rulings on the admissibility or exclusion of Dery's state-ments is not before us at this time, and we express no opinion on this matter.

In seeking to suppress the examination results, the state presented Dr. Leonard Saxe of Boston University as a witness. The holder of a Ph.D. in psychology from the University of Pittsburgh, Dr. Saxe is a consultant to the United States Congress, Office of Technology Assessment, who has had extensive experience with polygraph examinations. Doctor Saxe testified that he has published approximately six articles on the validity of polygraph testing and has testified before several congressional committees. According to Dr. Saxe's testimony, the polygraph has a high rate of error. Doctor Saxe testified that although the machine is a useful tool for measuring certain reactions produced by the body in response to different stimuli, there is absolutely no evidence that lying or deceptiveness is related to these bodily changes.

Doctor Saxe also testified that the accuracy of the test can be distorted if the subject gives untruthful responses to the control questions administered during a pretest examination. The accuracy of an examination is dependent upon the premise that an examinee's responses to control questions give the examiner a base line against which to measure the examinee's reactions to relevant questions. If an examinee is untruthful in response to control questions, there will be no difference when compared with untruthful responses to the relevant questions; the examinee would not appear deceptive.

Doctor Saxe also testified that the accuracy of a polygraph examination may be affected by the examinee's inability to recall effectively an incident in exactly the way the question is worded by the examiner. When a person repeatedly discusses an incident, the person's perception of the incident can change to reflect the last version discussed while the original memory of the incident is lost. Last, Dr. Saxe testified regarding countermeasures that may be effectively employed by an examinee to frustrate the reliability of the test results. Doctor Saxe testified that through these countermeasures guilty subjects can actually learn to appear nondeceptive. Such measures include tightening the sphincter muscles, squeezing one's toes, taking certain drugs, or controlling one's thoughts to promote relaxation. Doctor Saxe testified that there is evidence that even highly trained examiners are unable to detect the utilization of these countermeasures, which in turn alters the reliability of the test results.

After the hearing on the state's motion in limine, the trial justice issued a decision that provided that Dery would be allowed to introduce the results of the polygraph examination, not as independent substantive evidence, but for the limited purpose of corroborating Dery's testimony in the event that he testified in his own behalf.

Subsequently, both the state and Dery filed timely notices of appeal. The state argues that the results of the test should be inadmissible for any purpose. Dery urges that the results of the polygraph examination should be admitted substantively as well as for the purpose of corroborating his testimony if he testified at trial.

The resolution of the sole issue in this case requires that we review at this time our position concerning whether in this state evidence about the taking of a polygraph or lie-detector test or about the results of such a test is admissible in evidence.

In the case of *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), evidence of the results of a systolic blood pressure deception test was held inadmissible in the event of objection, and the "general acceptance" standard was first articulated. Since then, this standard has often been discussed in connection with the admission of scientific evidence. This test provides in essence that before a scientific principle or discovery may be considered for its evidentiary value, it must be "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.* at 1014. Since *Frye*, the overwhelming weight of authority has been that evidence of the results of polygraph examinations are inadmissible, and in most of these jurisdictions evidence regarding the taking or refusal to take such a test is likewise inadmissible. This view held by the substantial

majority of jurisdictions is succinctly stated in *State v. LaForest*, 106 N.H. 159, 207 A.2d 429 (1965). The Supreme Court of New Hampshire, regarding the admissibility of the results of polygraph examinations, wrote: "Nevertheless the results of these tests have been rejected by the courts as evidence of guilt or innocence of the accused by the overwhelming weight of judicial authority on the ground that these tests have not yet attained sufficient acceptance as an accurate and reliable means of ascertaining truth or deception." *Id.* at 160, 207 A.2d at 430 (quoted in *Powers v. Carvalho*, 109 R.I. 120, 124, 281 A.2d 298, 300 (1971)).

Many of the jurisdictions that subscribe to the view stated in *LaForest* also hold that any evidence regarding the taking or refusal to submit to a polygraph examination is likewise inadmissible. In *State v. Perry*, 274 Minn. 1, 142 N.W. 2d 573 (1966), the Minnesota court added in extension of the view it shares with the New Hampshire court that "evidence that such a test was taken or refused by a defendant cannot be brought to the jury's attention either directly or indirectly." *Id.* at 12, 142 N.W. 2d at 580.[2]

"In this jurisdiction, we have been open to evidence of developments in science that would tend to assist the trier of fact. 'This court has never been hostile to the proof of fact by evidence relating to scientific tests or experiments.'" *State v. Wheeler*, 496 A.2d 1382, 1388 (R.I.1985) (quoting *Powers v. Carvalho*, 109 R.I. at 125, 281 A.2d at 300). However, after review of the authorities and the evidence in this case, we are of the opinion that test results of polygraph examinations have not been established as scientifically reliable and accurate. Consideration of the testimony given in the instant case by Dr. Saxe, a person with great knowledge and experience concerning polygraph examinations, discloses many of the potential problems that contribute to the unreliability of the test results. These range from the fact that there is no evidence that lying or deceptive-

ness is related to the bodily reactions measured by a polygraph instrument to situations in which a guilty test subject, through the employment of certain "counter-measures," can actually learn to appear nondeceptive. Accordingly we are compelled to align our position with the great majority of jurisdictions that have decided against the admissibility of evidence regarding polygraph examinations.

In *Powers v. Carvalho* it was suggested in dictum that the results of a polygraph examination may be introduced into evidence for the jury's consideration on the question of credibility. 109 R.I. at 126, 281 A.2d at 301. Upon reflection we reject this suggestion. As illustrated by the facts of this case, the introduction of such test results on the question of guilt or innocence, or as corroboration evidence, would be equally misleading to a jury. In this case the factual issue of guilt or innocence depends upon a choice of credibility. The jury must determine whether Dery told the truth when he made the inculpatory statement or when he later denied his guilt. In cases like this one in which credibility is of paramount importance, the introduction of the test results for purposes of corroboration would invite speculation and misuse by the jurors in that they may assign excessive weight to the corroboration testimony and apply it when deciding the ultimate question of guilt or innocence.

Indeed, attempting to distinguish whether to consider this evidence on the issue of supporting the credibility of defendant's testimony or whether to consider it on the issue of guilt or innocence is a distinction so subtle as virtually to defy analysis. To attempt to instruct lay jurors concerning distinctions that are so elusive as to be nearly imperceptible gives rise to difficulties that have been recognized by the United States Supreme Court as practically impossible to surmount: "The fact of the matter is that too often such admonition against misuse is intrinsically ineffective in that the effect of such [testimony] cannot be wiped from the brains of the jurors.

---

**2.** See *Powers v. Carvalho*, 109 R.I. 120, 125, 281 A.2d 289, 300 (1971), for additional citations to cases from other jurisdictions following same rule of inadmissibility.

The admonition therefore becomes a futile collocation of words and fails of its purpose." *Bruton v. United States,* 391 U.S. 123, 129, 88 S.Ct. 1620, 1624, 20 L.Ed.2d 476, 481 (1968) (quoting *Delli Paoli v. United States,* 352 U.S. 232, 247, 77 S.Ct. 294, 302, 1 L.Ed.2d 278, 288 (1957) (Frankfurter, J., dissenting)).

We are thus of the opinion that the introduction of any information regarding polygraph examinations into evidence for any purpose would be likely to mislead the jurors rather than to assist them in the determination of the factual issues involved.

For the reasons stated, the state's appeal is sustained, the defendant's appeal is denied and dismissed, and the papers in the case may be remanded to the Superior Court for further proceedings consistent with this opinion.