**Jennifer CARR**

v.

**John MULHEARN et al.**

**No. 91–89–M.P.**

Supreme Court of Rhode Island.

Jan. 7, 1992.

Robert Mann, Mann & Mitchell, Providence, for plaintiff.

Marc DeSisto, Carroll, Kelly & Murphy, Providence, for defendants.

## OPINION

WEISBERGER, Justice.

This case arises from a question certified to this court by the United States District Court pursuant to Rule 6 of the Supreme Court Rules. The facts as relevant to the certified question are as follows.

The plaintiff, Jennifer Carr, was at all times pertinent to this matter employed as a civilian dog officer within the jurisdiction of the Warwick police department (department). During the course of an internal investigation by members of the department against plaintiff, she was asked to submit to a polygraph examination. The plaintiff was told that the department had written statements from a man with whom she allegedly had sexual relations and with whom she had allegedly smoked a marijuana cigarette in the back of her animal-

control van while on duty. In actuality the department did not have any such statements from this individual and, in fact, had not interviewed him at the time that its investigating officers questioned plaintiff. The plaintiff was told by the department that the only way to "clear up" the investigation would be to take a polygraph examination. She was further advised that if she chose not to take the examination, the investigation would proceed by other means. Initially plaintiff agreed to take the examination, but after being informed that her union would not support her decision, she declined to do so. The next day, plaintiff was again told that the only way to end the inquiry would be to submit to a polygraph examination. The plaintiff indicated at that time that she would be willing to undergo such an examination. However, after being given a copy of the statutes upon which basis the department's polygraph examiner had written a release for plaintiff, she declined once again. No disciplinary action has been taken against plaintiff for her refusal to take the polygraph examination, although members of the department testified that disciplinary action would have been taken had plaintiff failed the examination. The investigation remains open, and has not been resolved at the present time.

About one month after the polygraph requests, plaintiff filed suit in Federal Court against the city of Warwick and various city officials, alleging a violation of G.L.1956 (1986 Reenactment) chapter 6.1 of title 28, in regard to these requests while also advancing other claims. At the conclusion of trial, the jury found for plaintiff on the issue of whether defendants requested, required or subjected plaintiff to a lie detector test, as a condition of employment or continued employment, as proscribed by § 28–6.1–1, as amended by P.L. 1987, ch. 159, § 2. The defendants subsequently sought a ruling on their motion, which had been reserved, for a directed verdict and additionally moved for a judgment n.o.v., contending that the facts in evidence did not establish a violation of § 28–6.1–1. As this court has not previously interpreted the provisions of chapter 6.1

of title 28, the District Court certified a question of law herewith so that it might determine whether plaintiff's claim is sufficient under Rhode Island law.

■ The question certified to this court by the District Court is as follows: "Is the Polygraph Statute, R.I. Gen. Laws § 28–6.1 *et. seq.*, violated when an employer requests an employee to submit to a polygraph examination in connection with a pending allegation of wrongdoing and subsequent investigation?" We answer in the affirmative.

Chapter 6.1 of title 28 of the Rhode Island General Laws (entitled "Lie Detector Tests as Conditions of Employment") establishes a statutory cause of action against an employer who seeks to have an employee or prospective employee take a lie detector test as defined by § 28–6.1–4, as enacted by P.L.1987, ch. 159, § 1.[1] The chapter also provides for a criminal penalty under § 28–6.1–2, as enacted by P.L.1986, ch. 398, § 1, when an employee or prospective employee actually takes such an examination. Section 28–6.1–1, which sets forth the cause of action relevant to this certified question, provides in part:

> "Lie detector tests prohibited.—No employer or agent of any employer shall either orally or in writing request, require or subject any employee to any lie detector tests as a condition of employment or continued employment.
>
> "Provided, however that written examinations as defined in § 28–6.1–4 may be used as long as the results of such written examinations are not used to form

the primary basis for an employment decision."[2]

The question certified by the District Court asks us, in effect: when an employer has requested an employee to take a lie detector test as part of an investigation and the employee has refused to do so and has not been disciplined as a result, is this situation "a condition of employment or continued employment" such that the employee may bring suit under § 28–6.1–1? The plaintiff contends that when one is asked to take a lie detector test as part of one's job or hiring process, such a request constitutes a condition of employment or continued employment. The defendants assert that such a condition is only present if an employer conveys directly or indirectly that a refusal to take a lie detector test will lead to adverse actions being taken against an employee or a prospective employee. Our task here is to determine what the Legislature intended in enacting chapter 6.1 of title 28. After reviewing the language and history of chapter 6.1 in its entirety, we believe that the Legislature intended plaintiff's construction of § 28–6.1–1 to be given effect.

In 1986 the Legislature amended § 28–6.1–1 to prohibit an employer from "either orally or in writing request[ing]" an employee or a prospective employee applicant to take a lie detector test as a condition of employment or continued employment. P.L.1986, ch. 398, § 1. Prior to 1986 employers were proscribed from "requir[ing] or subject[ing]" employees or prospective employees to a lie detector test but could request that they take such an examination

---

1. General Laws 1956 (1986 Reenactment) § 28–6.1–4, as enacted by P.L.1987, ch. 159, § 1 defines "lie detector test" as used in chapter 6.1 of title 28 as "any test utilizing a polygraph or any other device, mechanism, instrument or written examination which is operated, or the results of which are used or interpreted by an examiner for the purpose of purporting to assist in or enable the detection of deception, the verification of truthfulness, or the rendering of a diagnostic opinion regarding the honesty of an individual."

2. Section 28–6.1–1, as amended by P.L.1987, ch. 159, § 2 which sets out the statutory cause of action for a violation of chapter 6.1, speaks in

terms of "employees" and does not mention prospective employees. It is evident, however, that the cause of action is extended to job applicants as well. Section 28–6.1–3 ("Punitive Damages and Attorney's Fees") provides, "In any civil action alleging a violation of this chapter, the court may: (1) award punitive damages to a prevailing employee or prospective employee in addition to any award of actual damages, and (2) award reasonable attorneys' fees and costs to a prevailing employee or prospective employee." Because these provisions must be read *in pari materia*, we come to the obvious conclusion that job applicants may avail themselves of the cause of action provided in § 28–6.1–1.

voluntarily. We believe that the Legislature would not have specifically amended § 28–6.1–1 in this fashion if the statute only embraces instances in which a refusal to take a lie detector test leads to adverse action being taken against an employee or a prospective employee. Such an interpretation would add nothing to the statute as it existed before 1986. A situation in which an employee or a prospective employee is adversely affected by refusing to take a lie detector test, or reasonably perceives that he or she would be so affected, is clearly a requirement or subjection.

By prohibiting employers from requesting that a lie detector test be taken voluntarily, the Legislature appears to have addressed more subtle forms of coercion in the workplace that sometimes blur the line between voluntariness and compulsion. A request to take a lie detector test is often tantamount to a demand to submit to such an examination. Many employees would be reluctant to refuse their employer's request, fearing adverse consequences resulting from such a refusal. It would be difficult in many instances for an employee to show that a request to take a lie detector test actually conveyed an implied message of punishment for refusal or was made against a background of coercion. It would similarly be difficult for a job applicant to demonstrate that by reason of a refusal to take a lie detector test he or she was not hired. Indeed it is likely that many applicants would submit to a lie detector request in order to avoid offending their potential employer. The employee or the applicant simply cannot know at the time of the request what the ultimate effect of a refusal might be, unless the employer is clumsy enough to tell him or her directly. Faced with this uncertainty, many employees or applicants would undoubtedly yield to an employer's request in order to avoid the possibility of trouble or offense.

We cannot accept defendants' contention that a plaintiff suing under § 28–6.1–1 may only prevail if he or she demonstrates as a factual matter that an employer conveyed directly or indirectly that a refusal to take a lie detector test would lead to adverse action. To read § 28–6.1–1 in this fashion would be to eviscerate the protection against the use of certain lie detector tests with which the Legislature intended to provide employees and prospective employees. We are charged in reviewing chapter 6.1 of title 28 with determining and effectuating what the Legislature intended in enacting the statute. The statute must be given a meaning "most consistent with its policies or obvious purposes." *City of Warwick v. Almac's, Inc.*, 442 A.2d 1265, 1272 (R.I. 1982). We are convinced that in enacting chapter 6.1 of title 28, the Legislature meant to protect employees and prospective employees from all situations in which they might be coerced, implicitly or explicitly, into taking any proscribed lie detector test. In extending such protection, the Legislature decided to prohibit the use of polygraphs and similar examinations in the workplace regardless of the circumstances in which these tests are to be given.

This interpretation of § 28–6.1–1 is borne out by consideration of chapter 6.1 in its entirety. In § 28–6.1–2 the Legislature set out the penalty for violations of § 28–6.1–1. In § 28–6.1–2 the Legislature made it a misdemeanor punishable by a fine of "not more than one thousand dollars ($1,000)" for "[a]ny employer who subjects any person employed by him, or any person applying for employment, to a lie detector test, or causes, directly or indirectly, any such employee or applicant to take a lie detector test." The only exception to this criminal penalty for administering a lie detector test is for "lie detector tests administered by law enforcement agencies in the performance of their official duties." *Id.* If lie detector tests were in fact permissible in situations in which an employer did not convey that a refusal to comply would lead to adverse action, the employer would be in the anomalous position of committing a crime if he or she actually administered the test. In establishing a criminal prohibition against "caus[ing], directly or indirectly, any such employee or applicant to take a lie detector test," the Legislature clearly proscribed the use of lie detector tests in the

workplace in all circumstances. It underscored this prohibition through enactment and development of a civil remedy under § 28–6.1–1 against employers who request, require, or subject an employee or applicant to a proscribed lie detector test.

In 1987 the Legislature created an exception to its prohibition of lie detector tests in the workplace. The 1987 amendment to § 28–6.1–1 provides in part, "Provided, however that written examinations as defined in § 28–6.1–4 may be used as long as the results of such written examinations are not used to form the primary basis for an employment decision." P.L.1987 ch. 159, § 1. In enacting the present statutory scheme, the Legislature has balanced concerns about the validity of polygraphs and issues of personal dignity surrounding their use with the need for employers to screen potential employees and to investigate employee misconduct. The Legislature has differentiated between polygraphs and written examinations. Under chapter 6.1 of title 28, the use of polygraphs and similar lie detector tests is prohibited in the workplace. Employers may, however, utilize written examinations as long they do not base a decision about an employee's or an applicant's status primarily on the results of such tests. Accordingly, written examinations are not to be considered "lie detector tests" under the penalty provisions of § 28–6.1–2.

In prohibiting polygraphs and similar lie detector tests while allowing written examinations, the Legislature was apparently concerned with the particular threats to dignity posed by the former type of examination. Polygraph examinations are highly physically intrusive. During an examination a number of sensors and electrodes are attached to the test subject to monitor a variety of physiological responses, including his or her rate and depth of respiration, cardiovascular activity, and perspiration. *See* Wiseman, *Invasion By Polygraph: An Assessment of Constitutional and Common Law Parameters*, 32 St. Louis U.L.J. 27, 28–29 (1987). Polygraph examinations also have the potential to invade an individual's privacy and subvert his or her free will in a more acute manner than do written examinations. Although the employee or applicant may refuse to respond to an intrusive question, the polygraph continuously records physiological responses, which are analyzed for "honesty." Consequently the test subject cannot choose those questions to which he or she will offer a response since he or she necessarily responds to all. By its very nature this process strips the individual of his or her volition and subjects him or her to a probe of what is supposedly that individual's "essence." *Id.* at 33; *see also* Hermann, *Privacy, the Prospective Employee, and Employment Testing: The Need to Restrict Polygraph and Personality Testing*, 47 Wash. L.Rev. 73, 153–54 (1971).

With regard to the scientific validity of polygraphs in assessing truthfulness or "guilt," this court has held that the results of polygraph examinations are inadmissible in the Rhode Island courts. Evidence regarding the taking of such a test or the refusal to take such a test is likewise inadmissible. *State v. Dery*, 545 A.2d 1014, 1016–17 (R.I.1988). Although we cannot be certain that the Legislature concurs with our particular conclusions in regard to the validity of polygraphs, it is reasonable to infer that the Legislature had similar concerns in prohibiting their use in the workplace. As we pointed out in *Dery*, there are a number of potential problems that contribute to the unreliability of polygraph test results. These range from the fact that there is no evidence that lying or deceptiveness is related to the bodily reactions measured by a polygraph instrument to the fact that there are situations in which a guilty test subject, through the employment of certain "counter-measures," can actually learn to appear nondeceptive. *Id.* at 1017. Other important factors relating to the reliability of polygraph-test results include examiner competence, psychological or physiological disorders, and psychophysiological differences in subjects due to age or intelligence. *See* Wiseman at 31; Note, *Lie Detectors in the Workplace: The Need for Civil Actions against Employers*, 101 Harv.L.Rev. 806, 810 (1988).

Employers have made increasing use of a variety of lie detector tests in order to screen employees or investigate misconduct. This is due to a number of reasons, including their supposed cost-effectiveness as an investigatory tool and the firm belief on the part of many employers that lie detector tests can determine employee honesty with scientific certitude. *See* Note, *The Employee Polygraph Protection Act of 1988—Should the Federal Government Regulate the Use of Polygraphs in the Private Sector?* 58 U.Cinn.L.Rev. 559, 571 (1989). It is evident that the statutory scheme set out in chapter 6.1 of title 28 is designed to eliminate polygraphs from the workplace while still allowing employers to use written examinations as a perceived cost-effective tool for ensuring a reliable work force. At the same time, in allowing the use of written examinations, the Legislature has admonished employers not to rely inordinately on those permissible examinations in making decisions regarding an employee's or an applicant's status.

In the facts certified to this court by the District Court, plaintiff was asked to submit to a polygraph examination to "clear up" an investigation launched against her by the Warwick police department. The plaintiff was advised that if she chose not to take the examination, the investigation would proceed by other means. After ultimately declining to take a polygraph test, the following day plaintiff was again requested to undergo such an examination. She was told once again that it was the only way to end the matter. At the time of these requests, the department did not in fact have any written statements from plaintiff's alleged coparticipant and had not yet interviewed him. Members of the department whom plaintiff had identified as being able to verify her whereabouts were not interviewed until more than three months after plaintiff filed suit or were not questioned at all. The investigation has not been concluded at the present time.

We believe that this is precisely the sort of situation that the Legislature had in mind when it enacted a prohibition against requesting an employee to take a polygraph or similar examination. The entire investigation was channeled toward influencing the plaintiff to take a polygraph test as a substitute for thorough factfinding. Taking the examination was the only means provided to the plaintiff to put to rest the charges against her. If an employer could request an employee to take a polygraph examination in conjunction with an allegation of wrongdoing, one might give credence to any accusation of misconduct, no matter how spurious, and continue an investigation unless the employee resolved any doubts against him or her by submitting to a polygraph test. Indeed in the instant case, despite the fact that from the record provided us the only evidence that ever existed against the plaintiff is pure speculation, the investigation remains open to this day. We are convinced that the Legislature intended to protect employees from such a state of affairs in enacting § 28–6.1–1.

From our reading of chapter 6.1 of title 28 in its entirety, we conclude that employers are prohibited from requesting, requiring, or subjecting an employee to a polygraph examination in connection with a pending allegation and subsequent investigation. Accordingly we respond in the affirmative to the question certified to us by the United States District Court.