DECISION
In an amended motion, Defendant Edward D. DiPrete seeks to have admitted as substantive evidence, in his trial on bribery and for RICO violations, portions of the results of a polygraph test to which he submitted on January 23, 1996. The test was arranged by defendant's counsel and administered by David Raskin, Ph.D. Defendant originally sought to have admitted the results of a test administered by Richard Johnson, similarly arranged for by his counsel, but has now asked that the Raskin results be substituted.
Although the defendant recognizes that the R.I. Supreme Court has previously rejected efforts to admit polygraph examination results, State v. Dery, 545 A.2d 1014 (R.I. 1988), he contends that that decision was premised on a standard which has since been rejected by the U.S. Supreme Court in Daubert v. Merrill DowPharmaceuticals. Inc., ___ U.S. ___, 113 S.Ct. 2786 (1993) in the light of certain rules of evidence. Consequently, defendant urges the court to ignore Dery's precedential value and grant his motion.
The State, in resisting the motion, continues to rely uponDery as well as post Daubert cases, excluding polygraph evidence based upon its unreliability.
In Daubert it was alleged that certain birth defects were caused by a mother's prenatal ingestion of the antinausea drug Bendectin. In deciding the issue of admissibility of scientific evidence, the court rejected the rigid test established in 1923 in the case of Frye v. United States 293 F. 1013. The Frye court held that before a scientific principle may be considered for its evidentiary value, it must be sufficiently established to have gained "general acceptance" in the particular field to which it belonged. The court in Daubert rejected this test in view of two federal rules of evidence, 702, dealing with scientific evidence and its assistance to a trier of fact, and 104, concerning the relevance and admissibility of evidence. It was the court's view that these rules required the trial judge in the first instance to screen proposed scientific evidence to ensure its reliability and to ensure that the evidence offered was relevant and would assist the trier of fact to determine a fact in issue.
In short, the trial judge is required to preliminarily assess whether the reasoning and methodology employed is scientifically valid and whether that reasoning and methodology can be properly applied to the facts in issue. Although no definitive test was established by Daubert, among the factors suggested for consideration were (a) the testability of the theory or technique; (b) their subjection to peer review and publication; (c) the standards controlling the technique and error rate; and (d) general acceptance in the scientific community, which was still considered by the court to have an important bearing on the inquiry.
Although the Frye principle was accepted in this jurisdiction prior to our own adoption of rules of evidence similar to those considered by the Daubert court, our own Supreme Court declared in State v. Wheeler, 496 A.2d 1382 (R.I. 1985), a case involving the admissibility of voice identification evidence, that it was open to evidence of scientific developments if that assisted the trier of fact. The attitude expressed in Wheeler preceded theDery decision, which in turn preceded the adoption of our rules of evidence which are of concern relative to the issue presently before the court.
Defendant presented for the court's consideration the testimony of one David Raskin, Ph.D, labeling him the preeminent expert in the field of polygraph testing. Doctor Raskin conducted a polygraph examination of defendant Edward D. DiPrete on January 23, 1996, and as a result thereof concluded that defendant was truthful when he denied ever arranging with anyone or personally receiving money or campaign contributions in return for the promise of a contract with the State.
During the hearing, Dr. Raskin's credentials as a psychologist and proponent of lie detector evaluation spanning some thirty years were elicited.
Doctor Raskin explained in detail the methodology and technique employed in administering the evaluation and the underlying assumption upon which it is founded. Basically, the subject is connected to an instrument which is capable of measuring physiological reactions to questions asked by the examiner employing the Control Question Technique (CQT) as was done in the test administered to the defendant. This technique involves the use of control and relevant questions. The former are vague in nature, involving extended periods of time in the subject's life, and are designed to produce uncertainty when the subject responds. Relevant questions are those concerning the specific matter being inquired into. It is assumed that an innocent subject will react more strongly to a controlled question than to a relevant question. Conversely, guilty subjects are more concerned with the relevant questions and will react more strongly to those than to controlled questions. The questions are then compared by the examiner who draws inferences of truthfulness or deception by comparing the subjects autonomic reactions to the respective questions, i.e., the recorded breathing, pulse, blood pressure, and galvanic skin response data. The inferences drawn are then interpreted by the examiner to determine if the subject answered the relevant questions truthfully or deceptively. Based upon laboratory and field studies, Dr. Raskin testified that the CQT method produces 90-95 percent accuracy in determining deception.
Leonard Saxe, Ph.D, and William Iacono, Ph.D, both professors of psychology at different academic institutions, testified against the validity and accuracy of lie detector examinations. Both had studied and published on the subject matter for many years.
Doctor Saxe testified that no one has linked physiological responses directly to deception because many things could cause an autonomic reaction, which he testified is a result of how the subject perceives the situation, not the question. Therefore, a test is susceptible to influence by whether the examiner is friendly and other conditions under which the test is conducted such as whether the subject knows the results will not be published, thereby lessening anxiety.
Doctor Saxe contends the evaluation under consideration suffers from numerous deficiencies, including the examiner being friendly, the location of the test, and the knowledge that the results, if negative, would not be published. He advances two other reasons why the results are not reliable. First, the process of habituation. Doctor Saxe explained the process as one where the subject has become so accustomed to giving deceptive responses that eventually those responses would produce none of the autonomic reactions typically associated with deception. Second, the relevant questions were too broad and general given the many instances in which it is alleged money was received for a specific benefit from a specific person. In this latter regard, Dr. Saxe alleges that Dr. Raskin violated one of his own standards in framing the relevant questions as he did. It is of interest to note that the first test administered by Mr. Johnson was discarded because Dr. Raskin felt the relevant question producing a negative result, (i.e., tending toward deception) was improperly framed.
Doctor Iacono testified that the basic premise of the lie detector technique is fatally flawed because there is no unique psychological reaction to deception, thereby agreeing with Dr. Saxe. He expressed great skepticism of the soundness of the lie detector evaluation, stating that he had a general lack of confidence that it works, and little confidence that it should be used in court.
Doctor Iacono testified that the opinions of Dr. Raskin on the validity and reliability of lie detector results are based primarily upon his own studies. Doctor Iacono further testified that a recently completed survey of psychologists revealed that the polygraph is not a generally accepted scientific technique.
Upon evaluating the relevant evidence and applying the requisite standard, the court would be hard pressed to conclude that the results of the proffered technique which was subject to variables such as (a) who the examiner was; (b) how the relevant questions were framed; (c) where and under what conditions the examination was conducted; (d) how many times the subject may have responded to like questions; (e) subjective inferences to be drawn by an examiner from recordings of physiological reactions to various questions; and (f) how variations were interpreted, was within the realm of scientific evidence which would be of assistance to the trier of fact, in this case the jury.
On the contrary, the court finds that such a technique is unreliable and of questionable validity based upon the testimony of Doctors Saxe and Iacono, which the court finds to have been objective and credible.
The court, therefore, denies the motion of defendant Edward D. DiPrete to allow the results of the polygraph test taken by him on January 23, 1996, as substantive evidence during the trial.