**STATE**

v.

**Jesus GARCIA.**

**No. 92–352–M.P.**

Supreme Court of Rhode Island.

June 13, 1994.

Richard Casparian, Public Defender, Janice Weisfeld and Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on a petition for certiorari to review the judgment of conviction of Jesus Garcia (defendant), who was found guilty on two counts of felony murder after a jury trial in Superior Court. For the reasons stated herein, we affirm the conviction. A summary of the pertinent facts follows.

## I

## FACTS AND PROCEDURAL BACKGROUND

On the evening of March 31, 1989, a multiunit tenement building located at 167 Dexter Street, Pawtucket, Rhode Island, was consumed by fire. Two men died after they entered the building to assist others to escape from the fire. After an approximately two-month investigation, defendant was charged by indictment No. P1/89–2038A with two counts of first-degree arson and two counts of felony murder.

The investigation revealed that on the day of the fire, defendant and his girlfriend's mother, Carolyn Hall (Carolyn), visited the Dexter Street apartment house in search of defendant's girlfriend, Elena Hall (Elena). The Dexter Street apartment house was apparently known as a "crack house" and was frequented by drug addicts. According to Carolyn, her daughter Elena, with defendant's help, was then fighting drug addiction. Believing that Elena had relapsed into using drugs, defendant and Carolyn searched several known drug houses and a bar on the day of the fire in an attempt to locate Elena. Prior to entering the Dexter Street building, defendant first made a cursory inspection of G & T Tavern, a bar next door to the Dexter Street apartment house. At apartment No. 8 in the Dexter Street apartment house, tenant Otis Taylor (Taylor) and several acquaintances were freebasing cocaine. Carolyn testified that while she spoke with one of the

Jeffrey Pine, Atty. Gen., Jane McSoley, Sp. Asst. Atty. Gen., and Aaron Weisman, Asst. Atty. Gen., for plaintiff.

occupants of apartment No. 8, defendant may have gone into apartment No. 6, a vacant apartment. After determining that Elena was not in the building, defendant and Carolyn left and continued their futile search.

Later that evening defendant returned to the G & T Tavern and the Dexter Street apartment house with Elena's sister, Billie Lynn Hall (Billie Lynn), to learn if Elena was present. While Billie Lynn remained in the car, defendant reentered the Dexter Street apartment house and the G & T Tavern next door. According to Billie Lynn, when defendant returned to the car, she smelled gasoline or alcohol on him. Billie Lynn then drove with defendant to one more bar in search of her sister. Approximately five to six minutes later, they drove by the Dexter Street apartment house, which was then on fire. Billie Lynn expressed concern that her sister might be inside the building, but defendant assured her that she was not.

Later that night defendant found Elena leaving a bar a short distance from the Dexter Street tenement. According to Elena, defendant grabbed her by the arm, walked her to the Dexter Street apartment house, proclaimed responsibility for the fire, and warned that he would burn every building in which she took drugs. On the same evening, defendant also told Maribel Domenech (Domenech), with whom he and Elena were living, that the next day's paper would contain a story about a big fire that he had set. The defendant explained to Domenech that he had used gasoline and a match to start the fire. Several days after the fire, defendant told another friend, Jose Azevedo, that he had used a lighter to burn a blanket in the Dexter Street apartment.

Inspector Donald Byrne (Byrne), a senior fire investigator of the State Fire Marshal's office, led the investigation of the fire. At trial he testified that he originally focused his attention on apartment No. 8 of the Dexter Street apartment house because of reports that freebasing of cocaine had occurred in the apartment that day and because there was evidence of an explosion in that apartment. After speaking to the occupants of apartment No. 8, however, Byrne refocused his investigation and came to the conclusion that the fire had originated in a mattress in apartment No. 6.

According to testimony at trial, Cora Lee Shelton (Shelton), who lived in apartment No. 8 of the Dexter Street apartment house with Taylor, was drinking and freebasing cocaine during the afternoon of March 31, 1989. Sometime during the afternoon she went out to do laundry and smelled smoke coming from apartment No. 6. Shelton and Taylor discovered a mattress in apartment No. 6 on fire, and Taylor attempted to douse the fire with water. Shelton proceeded to the "Laundromat," finished her laundry, and returned to the apartment house. Upon her return she did not smell any smoke, but a short time later when she again left the apartment, she was confronted with intense black smoke in the hallway. Shelton, Taylor, and another friend were forced to jump from the second-floor window to escape the fire.

The defendant was tried in Providence County Superior Court in September and October 1990. Prior to trial, the state dismissed the two counts of first-degree arson pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure. The jury, however, was unable to reach a verdict on the remaining counts of felony murder, and a mistrial was declared. When the case was retried in October 1991, the jury returned guilty verdicts on the two counts of felony murder. After defendant's motion for a new trial was denied, defendant was sentenced to concurrent terms of life imprisonment. A timely notice of appeal, however, was not filed. Thereafter, defendant filed a petition for review by common-law discretionary certiorari that we granted on September 17, 1992.

II

INSPECTOR BYRNE'S NOTES

The primary issue on appeal centers on the destruction of Byrne's investigative notes. The defendant maintains that the deliberate destruction of these notes by Byrne amounted to a violation of defendant's right to due process as well as his right to discovery under

Rule 16 of the Superior Court Rules of Criminal Procedure.

The notes had been compiled by Byrne throughout the investigation and included steps taken in the investigation, names of and statements from potential witnesses, and Byrne's own observations. In early June 1989, Byrne condensed his notes and the statements from the Pawtucket police and fire departments into a final report. According to Byrne, in accordance with his regular practice, he sifted through his own notes and extracted what he believed to be the relevant facts and information for inclusion in the report. In doing so, Byrne omitted information he deemed irrelevant in order to prevent the report from becoming "muddy." Thereafter, in accordance with his normal practice and procedure, Byrne destroyed his investigative notes.

Byrne's final report concluded that the fire was incendiary in nature and had begun in apartment No. 6 of the Dexter Street apartment house. On or about May 25, 1989, however, prior to Byrne's destruction of his notes, defense counsel learned that Byrne previously had come to the tentative conclusion that the fire had originated in apartment No. 8—an area to which defendant did not have access. The defendant, in addition to filing a motion for discovery under Rule 16 that sought, *inter alia*, all results and reports of the fire investigation, also orally moved at the May 25, 1989 bail hearing for the preservation and production of Byrne's investigative notes. At a pretrial hearing, however, Byrne testified that he never received the message to preserve his notes but followed his usual practice of destroying them. Byrne's final report made no reference to the investigation of apartment No. 8, nor to any tentative conclusion regarding apartment No. 8 as the place of origin of the fire.

After he discovered that Byrne had destroyed the original notes, defendant moved to dismiss the indictment prior to trial. At the pretrial hearing defendant argued that the destruction of the possibly exculpatory material violated his right to due process. The defendant also maintained that the state violated its discovery obligations under Rule 16 of the Superior Court Rules of Criminal

Procedure by failing to disclose Byrne's notes. The trial justice ruled that defendant had not shown that Byrne had destroyed the notes intentionally and denied the motion to dismiss.

## A. Due Process

Turning first to defendant's due-process argument, we agree with the trial justice's conclusion that the destruction of Byrne's notes did not amount to a violation of defendant's due-process right to a fair trial.

■ A violation of a criminal defendant's due-process right to a fair trial occurs whenever, upon request by a criminal defendant, the prosecutor intentionally or unintentionally suppresses evidence that has a material bearing on questions of guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963). Even in the absence of a defendant's request, the state has a constitutional duty to disclose any exculpatory evidence. *United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342, 354–55 (1976). All evidence that is "favorable to an accused," *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218, including evidence that could be used for impeachment, *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481, 490 (1985), is subject to disclosure. The state is not required, however, under *Brady* and its progeny, to open its files and allow "criminal defendants to comb [them] for any or all information that might be remotely useful." *State v. Wyche*, 518 A.2d 907, 908 (R.I.1986) (citing *Agurs*, 427 U.S. at 111, 96 S.Ct. at 2401, 49 L.Ed.2d at 354).

■ In order to safeguard a criminal defendant's due-process right to a fair trial, the Supreme Court "has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.'" *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413, 419 (1984). *See Arizona v. Youngblood*, 488 U.S. 51, 55, 109 S.Ct. 333, 336, 102 L.Ed.2d 281, 287 (1988) (citing *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193, 1202 (1982)). Two distinct

lines of cases concerning exculpatory evidence have evolved: *Brady* and its progeny address those instances in which the previously undisclosed exculpatory evidence *remains* in the government's possession whereas *Trombetta* and *Youngblood* provide the analytical framework for uncovering constitutional infirmities when the government is *no longer* in possession of the evidence. *United States v. Femia,* 9 F.3d 990, 993 (1st Cir. 1993).

Together *Trombetta* and *Youngblood* established a tripartite test to determine whether a defendant's due-process rights have been infringed by the failure of law enforcement personnel to preserve evidence. 9 F.3d at 993. This test requires a defendant to establish that the proposed evidence possesses, first, "an exculpatory value that was apparent before the evidence was destroyed, and [second, is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534, 81 L.Ed.2d at 422. Third, a defendant also must demonstrate that the failure to preserve the exculpatory evidence amounted to bad faith on the part of the state. *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337, 102 L.Ed.2d at 289; *Trombetta,* 467 U.S. at 488, 104 S.Ct. at 2533, 81 L.Ed.2d at 422.

The analysis articulated in *Trombetta* and *Youngblood* places strong emphasis on the good faith or bad faith on the part of the state. This emphasis stems in part from the realization that courts face a "treacherous task" in ascertaining the exculpatory value of lost or destroyed evidence. *Trombetta,* 467 U.S. at 486, 104 S.Ct. at 2533, 81 L.Ed.2d at 421. Moreover, the prominence afforded the bad-faith requirement is rooted in part in the Supreme Court's "unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause * * * as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337, 102 L.Ed.2d at 289. Thus, when evidence is missing or destroyed, "*unless* a criminal defendant can show bad faith on the part of the [state], failure to preserve potentially useful evidence does not constitute a denial of due process of law." (Emphasis added.) *Id.*

■ The instant case is analogous to the *Trombetta* and *Youngblood* line of cases in that the sought-after notes are no longer extant. The question thus becomes whether they were destroyed in bad faith. According to defendant, the omission from the final report of any reference to the original, tentative conclusion that the fire started in apartment No. 8, should be interpreted as "an attempt to suppress materially exculpatory evidence." The defendant argued that the exculpatory nature of the notes was apparent from the moment defendant was charged, approximately three weeks prior to the destruction of the notes, and thus "screamed for disclosure under *Brady.*" In defendant's view, these factors taken together, irrespective of Byrne's actual knowledge of defendant's request to preserve the notes, constituted bad faith. We disagree.

When Byrne drafted the final report, he utilized his own notes as well as statements from the Pawtucket police and fire departments to present a full picture of the investigation. Byrne used the police department's statement that listed the description and location of evidence taken from apartment No. 8 on the day after the fire. That police report also contained the preliminary conclusion that the fire had begun in apartment No. 8. Thus, if he *were* attempting to suppress evidence that exonerated defendant, Byrne could not succeed by merely destroying his *own* notes. Furthermore, Byrne was steadfast in his conclusion that the fire had begun in apartment No. 6. His final report was intended, *inter alia,* to demonstrate how he came to this conclusion. In light of this objective, it is amply reasonable to conclude that Byrne attempted to present a clear and concise report and that his omission of any reference to apartment No. 8, rightly or wrongly, was his attempt to keep the report from becoming cluttered with discarded theories.

Because most human endeavors—in literature, science, music, and police investigations—are the product of inevitable false

starts and revisions, we concur with the trial justice's ruling that there was no evidence of bad faith by Byrne when he destroyed his notes. Byrne acknowledged at the pretrial hearing that he had no recollection of receiving a message to preserve the notes. Although the state stipulated that the request to preserve the notes had in fact been relayed, an assistant attorney general could not recall whether he spoke with Byrne directly or left a message. It is possible, and there are no facts to indicate otherwise, that Byrne never received the message. This conclusion is buttressed by the fact that it was Byrne's normal practice and procedure to destroy his notes after transposing them into a final report. Therefore, destruction of Byrne's notes was not an isolated incident that could trigger suspicion about his intentions. Thus, because Byrne was not shown to have acted in bad faith in suppressing possibly exculpatory evidence, the destruction of the notes in this case did not result in a violation of defendant's due-process right to a fair trial. *See Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337, 102 L.Ed.2d at 289.

### B. Rule 16 Issue

The defendant alternatively argued that dismissal of the indictment is warranted because the state violated Rule 16 of the Superior Court Rules of Criminal Procedure. Rule 16(a) provides in pertinent part:

> "*Discovery by Defendant.* Upon written request by a defendant, the attorney for the State shall permit the defendant to inspect or listen to and copy or photograph any of the following items within the possession, custody, or control of the State * * *:

> \* \* \* \* \* \*

> "(5) all results or reports in writing, or copies thereof, of physical or mental examinations, and of scientific tests or experiments made in connection with a particular case."

Prior to the destruction of the notes, defendant made two motions: a general, written request, and an oral, specific request, for preservation of the notes. The state's failure to comply with these discovery motions, in defendant's view, violated Rule 16.

Although "[t]here is no general constitutional right to discovery in a criminal case," *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30, 42 (1977), states are free to implement discovery procedures. *State v. Coelho,* 454 A.2d 241, 244 (R.I.1982). If discovery procedures have been enacted by a state then "failure to comply with [discovery] rules * * * may violate the defendant's due-process rights to establish the best available defense." *Id.*

■ Under Rhode Island law, a criminal defendant may obtain pretrial discovery pursuant to Rule 16, arguably the most liberal discovery rule in the country. *Id.; accord State v. McParlin,* 422 A.2d 742, 745 (R.I. 1980). The primary purposes of the rule are to eliminate surprise at trial and "to ensure that both parties receive the fullest possible presentation of the facts prior to trial." *State v. Concannon,* 457 A.2d 1350, 1353 (R.I.1983). If either party fails to comply with the rule, sanctions may be imposed pursuant to Rule 16(i). However, the determination of whether any harm has resulted from noncompliance with discovery motions and whether the harm can be mitigated is within the sound discretion of the trial justice. *Coelho,* 454 A.2d at 245.

The instant case requires, as does any Rule 16 case, a determination of "whether a Rule 16 violation occurred and * * * if so, whether the trial justice abused his discretion in fashioning a remedy." *State v. La-Chapelle,* 638 A.2d 525, 530 (R.I.1994).

■ Byrne's notes were destroyed after defendant, pursuant to Rule 16, had made two motions for their production. The state, however, has maintained on appeal that the notes were not discoverable under Rule 16. Consequently, the state argued, no Rule 16 violation occurred because discovery under Rule 16 does not encompass the working notes of enforcement personnel.[1] If we as-

---

1. We note that notwithstanding the possible merit of the state's position, the record is devoid of any objection by the state to defendant's motion for the production of these notes. Given that defendant filed no fewer than three written motions for production of the notes, we point out

sume, for the moment, without deciding, that the notes *were* discoverable under Rule 16 and that the state's failure to produce them therefore amounted to a violation of Rule 16, *Coelho* provides direction to the trial justice, and this court on appeal, in fashioning a remedy for such a violation. We must consider "(1) the reason for nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors." 454 A.2d at 245. In cases in which the nondisclosure has been deliberate, the basic precepts of due process have been violated, and this court will grant a new trial without inquiry into the degree of harm produced by the misconduct. *Concannon,* 457 A.2d at 1353.

The defendant has argued that Byrne destroyed the notes deliberately, and therefore, under *Concannon,* we must grant a new trial. The defendant, however, has misapplied *Coelho's* first consideration. It is the deliberate *nondisclosure* of discoverable evidence that violates a defendant's right to due process. In the instant case, although Byrne deliberately *destroyed* the notes, he did so without the deliberate intent to prevent their disclosure. As discussed *supra,* Byrne never received the message requesting that he preserve his notes. Thus, although his act of destruction was deliberate, the resulting nondisclosure was inadvertent.

Having determined that the state's failure to provide materials was inadvertent, our inquiry is controlled by the prejudice inflicted on defendant. *State v. Bibee,* 559 A.2d 618, 621 (R.I.1989); *Concannon,* 457 A.2d at 1354. As *Concannon* noted, the objective of Rule 16 is the prevention of "procedural" rather than "substantive" prejudice. 457 A.2d at 1354. Thus, in order "[t]o demonstrate procedural prejudice on appeal, defendant must show that had the information been disclosed, there is a likelihood that trial counsel * * * could have created a reasonable doubt in the minds of one or more jurors to avoid conviction." *Id.* Therefore, we ex-

amine the effect of the nondisclosure on the defense's preparation for trial. *Id.*

In the instant case, defendant learned on May 25, 1989, at the bail hearing, that the fire inspector initially suspected that the fire had originated in apartment No. 8. Within a month of this discovery, defendant retained the services of an expert on the cause and origin of fires to inspect the premises and to come to his own, independent conclusion on the cause and origin of the fire. Although defendant's expert did not have Byrne's handwritten notes describing the activities in apartment No. 8 the day after the fire, the expert did have the Pawtucket police and fire reports that recited the investigative steps taken on the day after the fire. The police report listed the items seized for testing and the locations from which they were seized. The defendant nevertheless contended that the destruction of the notes prevented the discovery of a potential witness who could corroborate defense expert's theory that an explosion occurred in apartment No. 8. During the pretrial hearing Byrne testified that on the night of the fire he spoke to a witness who heard an explosion prior to the fire department's arrival on the scene. We are of the opinion, however, that the inability to find the witness and present this testimony did not have an impact on defendant's pretrial preparation, nor was it of such significance that defense counsel "could have created a reasonable doubt in the minds of one or more jurors." *Concannon,* 457 A.2d at 1354.

We are persuaded first by the fact that it is unclear that the witness's name actually appeared in Byrne's original notes. Although Byrne testified that he presumptively would have included the name of such a witness, he also candidly conceded that he relied to a large extent on the Pawtucket police department's interviews of witnesses and the police department's recitation of what the witnesses had observed. In addition any possible impact of this one individual's testimony regarding a possible explosion would have been minimal in light of the evidence produced at trial. Consequently,

that the state, if not time barred, has waited until this review to contest the discoverability of the working notes under Rule 16 of the Superior Court Rules of Criminal Procedure. *E.g., Wor-*

*dell v. Wordell,* 470 A.2d 665, 668 (R.I.1984) (Supreme Court does not consider for first time on appeal objections that were not raised in trial court).

we conclude that defendant was not prejudiced by the destruction of the investigative notes.

Steps 3 and 4 of *Coelho's* analysis require consideration of the feasibility of rectifying the prejudice inflicted by the nondisclosure as well as other relevant factors. *Coelho,* 454 A.2d at 245. Because we hold that defendant was not prejudiced by the nondisclosure, there is no prejudice for the trial court to rectify. Despite this fact, it is important to note, the trial justice did give defendant ample latitude during the cross-examination of Byrne to inquire into Byrne's original conclusion that the fire had originated in apartment No. 8, as well as to inquire into the destruction of the notes. These factors, coupled with the inadvertence and nonprejudicial impact of the nondisclosure, lead to the inescapable conclusion that defendant's due-process right to present the best available defense was not infringed upon.

### III

### MOTION TO SUPPRESS

Prior to trial, in addition to moving to dismiss the indictment, defendant also moved to suppress statements he made to the Pawtucket police department.[2] The defendant argued that the state failed to meet its burden of demonstrating that defendant's statements were given voluntarily, after a knowing and intelligent waiver of his *Miranda* rights. In support of his position, defendant relied heavily on the fact that the state did not provide defendant with a Spanish interpreter prior to interrogating him. The defendant also alleged that the police officers coerced and intimidated him in order to extract a statement. The defendant argued that in light of his Cuban-based fourth-grade education and his limited knowledge of "a bit of 'street' English," the waiver of his constitutional rights cannot stand and thus the statements should have been suppressed. We disagree.

██ It is axiomatic that prior to admitting a criminal defendant's statement into evidence, the state must establish by clear and convincing evidence that the statement was voluntary and that the defendant knowingly and intelligently waived his *Miranda* rights. *State v. Espinosa,* 109 R.I. 221, 230, 283 A.2d 465, 469–70 (1971). A trial justice's decision on a motion to suppress will not be reversed unless we determine it was "clearly erroneous." *State v. Collins,* 543 A.2d 641, 650 (R.I.1988). When reviewing the trial justice's decision, this court views the evidence in the light most favorable to the state. *Id.* "Findings of fact will not be disturbed unless the trial justice misconceived or overlooked material evidence or otherwise was 'clearly wrong.'" *State v. Marini,* 638 A.2d 507, 513 (R.I.1994).

#### A. Voluntariness of Statements

The ultimate test of voluntariness "is whether the defendant's statements were 'the product of his free and rational choice' * * * or the result of coercion that had overcome the defendant's will at the time he confessed." *State v. Amado,* 424 A.2d 1057, 1062 (R.I.1981) (quoting *Greenwald v. Wisconsin,* 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77, 80 (1968)). In making this determination, the court must take into consideration all facts and circumstances surrounding the statement. *Marini,* 638 A.2d at 512.

██ Our review of the record revealed that defendant made his statements to the police voluntarily. Although at the suppression hearing defendant testified that he was in fear of the police when he gave the statements, the only instance of intimidation defendant could relate was that the police detective told him "not to make them upset because if [he] made them upset * * * [the detective] was going to be—to feel bad and something could happen." Nevertheless, the trial justice found that defendant's state-

**2.** The statements defendant sought to suppress reflected defendant's inconsistent accounts of his activities on the evening of the fire. During his first interview, defendant stated that he did not enter the Dexter Street apartment house when he returned to the area a second time with Billie Lynn. However, defendant subsequently admitted that he searched the Dexter Street apartment house for Elena when he returned to the area with Billie Lynn—shortly before the fire ignited.

ments were voluntary. Implicit in his finding was the rejection of this statement.

Nothing in our review of the record indicates that the trial justice's ruling was clearly wrong. *See Marini,* 638 A.2d at 513. The record is devoid of any facts supporting defendant's contention that a threat occurred, other than this ambiguous statement. The alleged intimidation and resulting fear that defendant cited were not explained or evidenced beyond defendant's recitation of the statement above. We are of the opinion that this statement alone, taken without substantiated facts and in light of the surrounding circumstances, does not rise to the level of undue coercion. Therefore, we conclude that defendant's statements were voluntary and not the product of official coercion.

### B. *Miranda* Rights

■ The defendant also challenged the trial justice's determination that defendant had waived his *Miranda* rights. "A voluntary, knowing, and intelligent waiver of *Miranda* rights must be shown by the state before comments made by a defendant during *custodial interrogation* can be admitted into evidence." *Marini,* 638 A.2d at 511. Although an express written or oral statement is usually strong proof of waiver, the critical inquiry must focus on "whether the defendant *in fact* knowingly and voluntarily waived the rights delineated in the *Miranda* case." (Emphasis added.) *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979). The appropriate standard that must be applied to determine a valid waiver is the " 'totality-of-the-circumstances approach.' " *Amado,* 424 A.2d at 1061. Thus, " 'the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused,' " must be taken into consideration by the court. *Butler,* 441 U.S. at 374–75, 99 S.Ct. at 1758, 60 L.Ed.2d at 293.

In the instant case, defendant contradicted the signed waiver form and the testimony of the police detective and an assistant attorney general and maintained that he was never informed of his constitutional rights. At the suppression hearing defendant explained that when he signed the waiver form, allegedly four days after questioning, he could not read or write English and only signed the form because he had been asked to do so by the police. The defendant also testified that he does not understand English very well and did not understand most of his conversation with the police detectives or the assistant attorney general. At the conclusion of the suppression hearing, however, the trial justice found defendant sufficiently fluent in conversational English to have understood his constitutional rights and thus found defendant to have knowingly and intelligently waived his rights. Review of the record supports the trial justice's conclusion.

During cross-examination defendant admitted that he told the assistant attorney general that he understood a little English. Although born and schooled in Cuba, defendant acknowledged that he had been in the United States for ten years. In addition, defendant also revealed during cross-examination that his girlfriend, Elena, with whom he had lived for approximately three weeks, spoke English and had only limited knowledge of Spanish. Moreover, Carolyn and Billie Lynn, the individuals who assisted defendant in his search for Elena on the night of the fire, did not speak any Spanish.

Pawtucket Police Detective Joseph Corey (Corey) testified at the suppression hearing that he interviewed defendant on April 26, 1989. Prior to the interview, Corey asked defendant whether he understood English, and defendant answered that he did. Corey testified that he then proceeded to read defendant his rights from a rights-waiver form and to ask defendant if he understood his rights. The defendant acknowledged that he did and proceeded to answer the detective's questions.

Upon taking the stand at the suppression hearing, an assistant attorney general testified that he initially inquired whether an interpreter was available, but defendant agreed to proceed without one because defendant acknowledged that he understood English "well enough." After reading defendant his rights from the signed waiver form and after defendant said that he understood his rights, he and defendant had a twenty to thirty-minute conversation. The assistant at-

torney general opined that during this conversation defendant responded appropriately to the questions and appeared to understand what was being said. At no time during the interrogation did defendant seek the assistance of an interpreter or tell the assistant attorney general that he did not understand. Indeed, defendant gave an oral statement in English that the police detectives and the assistant attorney general readily understood.

In light of all these factors, we are of the opinion that the trial justice correctly concluded that defendant was sufficiently fluent in the English language to have waived his *Miranda* rights knowingly and intelligently. As we recently noted, statements by defendants "are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *State v. Leuthavone*, 640 A.2d 515, 520 (R.I.1994) (quoting *Moran v. Burbine*, 475 U.S. 412, 426, 106 S.Ct. 1135, 1143, 89 L.Ed.2d 410, 424 (1986)). In essence, that interest would be circumvented were we to permit defendant and others similarly situated, despite being sufficiently fluent in the English language, to hide behind their native languages to "avoid the ramifications of self-incrimination during custodial interrogation." *Leuthavone*, 640 A.2d at 520. Accordingly, we hold that defendant voluntarily, knowingly, and intelligently waived his constitutional rights, and that, therefore, the trial justice correctly denied the motion to suppress.

## IV

## CONCLUSION

We have carefully reviewed the remaining issues raised on appeal, and we consider them to be without merit. Examination of the jury instructions revealed that the trial justice properly instructed the jury on the elements of first-degree arson. *See* G.L.1956 (1981 Reenactment) § 11–4–2, as amended by P.L.1983, ch. 185, § 1. In addition, we are of the opinion that the trial justice properly permitted the lay witness's testimony to stand. *See State v. Fogarty*, 433 A.2d 972, 974–76 (R.I.1981).

Consequently, for the reasons stated herein, the petition for certiorari is hereby denied. The writ heretofore issued is quashed. The papers in the case may be remanded to the Superior Court with our decision duly endorsed thereon.