STATE

v.

**David ROBERTS and Babatunde Akinjobe.**

No. 2002–405–C.A.

Supreme Court of Rhode Island.

Nov. 14, 2003.

Janice Weisfeld, Esq., Providence, Marcy Coleman, Esq., for Plaintiff.

Daniel Schrock, Esq., for Defendant.

Before WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

GOLDBERG, Justice.

This case came before the Supreme Court on October 8, 2003, pursuant to the appeal of the defendants, David Roberts (Roberts or defendant) and Babatunde Akinjobe[1] (Akinjobe or defendant), from judgments of conviction for murder, conspiracy to murder, assault with a dangerous weapon and carrying a pistol without a license. The defendants argue that the trial justice erred in denying their motions to dismiss based upon the state's failure to preserve evidence and for refusing to give a lost evidence instruction to the jury.

### Facts and Travel

On the evening of May 13, 2000, Alejandro Brown (Brown) was gunned down after exiting Chaps nightclub in the city of Providence. Brown and his cousin, Jarrett Benton (Benton), had gone to Chaps that night in response to a request for assistance from Brown's sister, Yvette Brown (Yvette), in an unrelated dispute. After a brief encounter with his sister, Brown met Roberts and a confrontation ensued that led both men to abruptly leave the establishment.

According to Yvette, after this altercation, she observed Akinjobe enter the club; he was carrying two guns wrapped in a jacket. Yvette testified that as she was leaving the club with her brother, Akinjobe handed one of the firearms to Roberts. While standing at the door of the club, Yvette had a verbal exchange with Roberts and watched him leave the club with Akinjobe.

Yvette further testified that she joined Brown and Benton in Benton's car, which was parked in front of the club. Benton was the driver, Brown was in the front passenger seat and Yvette sat in the back seat behind the driver. According to Yvette, as the vehicle pulled away from the curb, shots were fired from behind the car. Benton, fearing for his life, attempted to flee; however, he struck a parked vehicle and ran from the scene. Yvette testified that when the shooting began, she ducked down and across the back seat of the vehicle, facing the passenger side.

Yvette testified that she then saw Roberts and Akinjobe approach the right passenger side of the vehicle and fire their weapons directly at Brown. When the police arrived it was apparent that both defendants had fled the scene. After the shooting, Yvette got out of the vehicle and ran to her brother's side, where she remained until medical assistance arrived. Brown suffered six gunshot wounds and subsequently died from his injuries. Benton suffered two gunshot wounds to his back. Yvette testified that glass from the car's windshield became embedded in her back. The care, custody and control of Benton's automobile by the Providence Police Department gives rise to the issues in this case.

---

1. We note that there are several different spellings of defendant's name throughout the record. We have taken this spelling from the trial transcripts and the parties' briefs.

The first officer to respond attempted to secure the automobile by locking three of its doors and remaining with the vehicle until other officers arrived. However, the car was further damaged when one of Brown's family members put his fist through the rear driver's side window in an attempt to gain access to the vehicle. Detective Patricia Cornell (Det. Cornell) of the Bureau of Criminal Identification, testified that the car and surrounding area was intensively searched by members of the Providence Police Department. Detective Cornell testified that she photographed the vehicle, measured each of the bullet holes, and took note of the external damage. The vehicle was towed to a city garage for further examination and the seizure of projectile fragments from its interior.

Detective Cornell alerted the towing company to the fragile condition of the bullet-riddled windows and requested that extra care be taken to keep the windows intact during the transport. At the city garage, Det. Cornell took additional photographs of the vehicle, including photographs of each bullet hole. She also removed and collected bullet fragments from the vehicle's interior, which she submitted to Robert Hathaway (Hathaway), a firearms examiner from the Rhode Island State Crime Laboratory.

After completing her examination, Det. Cornell directed the towing company to retain possession of the vehicle at its own garage. However, despite Det. Cornell's express orders to hold the car, the towing company eventually sold the vehicle to a salvage yard, where several portions of its interior components were dismantled and removed.

A few weeks before trial, upon the state's request, Hathaway examined the car but was unable to conduct a trajectory analysis.[2] At that time, the driver's seat, tires, engine, front passenger window and center console were missing from the vehicle. The rear window and back door also had been removed and were located on the back seat of the vehicle. Hathaway testified that determining a conclusive trajectory analysis in a vehicle with multiple projectiles always is difficult. According to Hathaway, had the vehicle been in pristine condition, he "could have *tried* to establish a certain trajectory pattern;" but he spoke nonetheless in terms of possibility. (Emphasis added.)

### Issues

The defendants have raised two issues in their appeal. First, they assert that the trial justice erred in denying their motion to dismiss the indictment based on the destruction of what they characterize as crucial evidence. The defendants allege that they were prejudiced by the state's failure to conduct a forensic examination of the vehicle before it was impounded in the towing company's lot. The defendants argue that a trajectory analysis *may* have impeached Yvette's testimony and, because her eyewitness testimony provided the only connection between the shooting and defendants, this prejudice warranted dismissal of the indictment. Second, defendants argue that the trial justice erred when he refused to instruct the jury that it could draw an inference unfavorable to the state as a result of the wrongful destruction of crucial evidence.

### Motion to Dismiss

■ Turning first to defendants' due-process contentions, we agree with the trial justice's conclusion that the dismantling

---

2. Hathaway testified that he typically does not examine crime scenes and conducts a crime scene trajectory analysis only upon special request.

of Benton's car did not violate defendants' due-process rights, nor did the loss of potentially impeaching evidence deprive defendants of their right to a fair trial. In this case, we are satisfied that the dubious probative value of evidence of a projectile trajectory and defendants' failure to demonstrate that the state acted negligently or in bad faith is dispositive of the issues before the Court.

 It is well settled that to establish a due process violation in circumstances in which potentially exculpatory evidence has been lost or destroyed, a defendant must show that: (1) the evidence possessed "an exculpatory value that was apparent before the evidence was destroyed," *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413, 422 (1984), (2) the defendant would be unable to obtain comparable evidence by other reasonable means, *id.*, and (3) the state acted in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289 (1988). Exculpatory evidence includes evidence that is favorable to an accused and is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963). The distinction between impeachment evidence and exculpatory evidence was rejected by the United States Supreme Court in *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 108 (1972), holding that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,'" impeachment evidence falls within the *Brady* rule.

The defendants argue that because potential trajectory evidence may have impeached Yvette's testimony, the vehicle possessed an exculpatory value that was apparent before it was dismantled. We reject this argument.

According to firearms examiner Hathaway, it is difficult to establish a trajectory pattern in a vehicle into which multiple projectiles have been fired. The most Hathaway would predict was that if the vehicle had been in pristine condition, he "could have *tried* to establish a certain trajectory pattern." (Emphasis added.) Consequently, given the difficulty of this analysis, defendants' contention that this evidence could have been produced and was in fact exculpatory is pure speculation. Nor are we satisfied that the alleged exculpatory value of a trajectory pattern was apparent before the vehicle was destroyed.

 Accordingly, defendants have failed to demonstrate that this evidence was exculpatory and that the alleged exculpatory value was known to the police before the vehicle was destroyed. Therefore, defendants have failed to prove that the police acted in bad faith. As this Court previously discussed in *State v. Garcia*, 643 A.2d 180, 185 (R.I.1994), the Supreme Court of the United States has placed a strong emphasis upon the bad faith element of the tripartite test. The significance of this element is based upon the Supreme Court's reasoning that requiring defendants to show bad faith on the part of the state,

"limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it; *i.e.* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337, 102 L.Ed.2d at 289.

Consequently, "when evidence is missing or destroyed, '*unless* a criminal defendant can show bad faith on the part of the [police], failure to preserve potentially useful evidence does not constitute a denial of

due process of law.'" *Garcia,* 643 A.2d at 185 (quoting *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337, 102 L.Ed.2d at 289).

The record discloses that Det. Cornell undertook extensive measures to document the crime scene and the condition of the vehicle. Detective Cornell requested that the towing company take special care in towing the vehicle so as to preserve its fragile windows. Most importantly, she directed the towing company to retain the vehicle until further notice. It was the practice of the police department to entrust vehicles to various towing companies for storage, and Det. Cornell testified that she had previously entrusted property to this towing company without incident. Given the care with which the police attempted to preserve and document the vehicle's condition coupled with the fact that there was no suggestion that the towing company would disregard Det. Cornell's instructions to hold the vehicle, we cannot conclude that the police acted negligently or in bad faith.

Unlike instances in which the arresting officers have lost or destroyed evidence in their possession, this vehicle was under the care of a private entity when its putative evidence was lost. Detective Cornell entrusted the vehicle to the towing company in accordance with routine procedure and with no indication that the towing company would disregard her directives to hold the vehicle. Although defendants argue that the actions of the towing company should be imputed to the state, there is simply no evidence in the record to suggest that the towing company was the agent of either the police or the prosecution.[3]

We also note that defendants had ample opportunity to cross-examine Yvette at trial. During two days of cross-examination, the defense illustrated numerous inconsistencies between Yvette's police statement, grand jury testimony and her testimony before the jury. These inconsistencies touched on the identities of those present that night, what was said and done by whom, where people were located throughout the evening, the color of the shooter's clothing and other relevant information. The record in this case is replete with inconsistencies and contradictions demonstrating that defendants had ample opportunity to impeach Yvette, yet the jury still chose to believe her eyewitness testimony. Accordingly, we reject defendants' argument that they were unable to conduct a full and fair cross-examination, regardless of the information that might have been disclosed from a trajectory analysis.

The defendants have not established a due process violation under the lost evidence test. They have failed to prove that a trajectory analysis possessed an exculpatory value that was apparent before the evidence was destroyed. More importantly, they also failed to establish that the police acted in bad faith.

### Jury Instructions

▉▉▉ Under the doctrine of spoliation of evidence,[4] "the deliberate or negligent destruction of relevant evidence by a party to litigation may give rise to an inference that the destroyed evidence was unfavora-

---

3. *See Powers v. State,* 734 A.2d 508, 519 (R.I. 1999) (holding that a Massachusetts State Trooper was not a member of the prosecution team when he testified as an expert witness); *State v. Tavares,* 590 A.2d 867, 872 (R.I.1991) (medical examiners and health department toxicologists employed by the state were not law-enforcement personnel for purposes of

R.I.R. Evid. 803(8)(B)); *State v. Manocchio,* 497 A.2d 1, 7 (R.I.1985).

4. Also known as the doctrine *omnia praesumuntur contra spoliatorem. Tancrelle v. Friendly Ice Cream Corp.,* 756 A.2d 744, 748 (R.I.2000) (quoting Black's Law Dictionary 1086 (6th ed.1990)).

ble to that party." *Tancrelle v. Friendly Ice Cream Corp.*, 756 A.2d 744, 748 (R.I. 2000). Although a spoliation instruction is improper when " 'the destruction was a matter of routine with no fraudulent intent,' " it is appropriate when "the act was intentional or intended to suppress the truth." *State v. Barnes*, 777 A.2d 140, 145 (R.I.2001) (quoting 29 Am.Jur.2d *Evidence* § 244 at 256 (1994)).

Recently, in *Kurczy v. St. Joseph Veterans Association, Inc.*, 820 A.2d 929 (R.I. 2003), we upheld a spoliation instruction when the defendant failed to produce copies of its board-meeting minutes despite testimony establishing that minutes normally were kept in the regular course of the board's business. Although the plaintiff in *Kurczy* could not establish that the unavailable evidence intentionally was destroyed in anticipation of trial, we upheld the spoliation instruction to prevent defendant from benefiting from "its own unexplained failure to preserve and produce responsive and relevant information during discovery." *Id.* at 947.

Unlike *Kurczy*, the loss of evidence in this case is not the result of the unexplained failure of the police, it is the result of the deliberate actions of a third party. The record demonstrates that the police did not deliberately destroy the vehicle. As noted by the trial justice, the decision to salvage the vehicle was solely that of the towing company. The only deliberate actions that the police took were the efforts they made to preserve and document the condition of the vehicle, including their decision to entrust it to the towing company.

Apart from establishing deliberate destruction, defendants also have failed to establish that the police acted negligently. As we previously have discussed, authorizing a towing company to assume custody of the vehicle does not amount to negligence. It was the practice of the police department to entrust vehicles to private towing companies for storage, and Det. Cornell had used this towing company's services in the past without incident. She explicitly instructed the towing company to retain the vehicle until further notice. There simply was no indication that the towing company would act in contravention of her directives, and consequently, defendants have failed to establish negligence on the part of the state.

Although the threshold for granting a spoliation instruction is lower than that required for dismissal of an indictment, defendants must establish negligence by the state, and they have failed to do so. Having concluded that the state did not act deliberately, negligently or in bad faith by entrusting the vehicle to the towing company, we affirm the trial justice's refusal to give a spoliation instruction.

### Conclusion

For the reasons stated herein, the judgments of the Superior Court are affirmed. The record in this case shall be remanded to the Superior Court.