STATE

v.

Keith A. **WERNER.**

No. 1996–570–C.A.

Supreme Court of Rhode Island.

July 1, 2004.

Lauren Sandler Zurier, Esq., Providence, for Plaintiff.

Paula Rosin, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, and SUTTELL, JJ.

## OPINION

WILLIAMS, Chief Justice.

A jury convicted the defendant, Keith A. Werner (defendant), on one count of robbery pursuant to G.L.1956 § 11–39–1, two counts of assault with a dangerous weapon pursuant to G.L.1956 § 11–5–2, and one count of larceny over $500 pursuant to G.L.1956 § 11–41–1. The trial justice then sentenced the defendant to the maximum time in prison under the sentencing guidelines and, relying on the habitual offender statute, G.L.1956 § 12–19–21, declared that the defendant would not be eligible for parole until "the last day of [his] 45th year in jail." The defendant now appeals on several different grounds, including the trial justice's refusal to allow defendant to call an expert witness to testify about eyewitness testimony, the trial justice's refusal to provide money for defendant to take a polygraph test and admit the results at trial, and the trial justice's failure to dismiss the case pursuant to the Interstate Agreement on Detainers Act, G.L.1956 chapter 13 of title 13.

## I

### Facts and Travel

Around 9 p.m. on March 7, 1992, Ann Holzinger (Holzinger), who was five months pregnant, closed the Picway shoe store (store) that she managed on Bald Hill Road in Warwick, Rhode Island. She then drove to the nearby Fleet Bank (bank) to deposit three bags from the store containing $2,322.15 in cash and checks. As per company policy, Michelle Porto (Porto), a fellow employee, followed Holzinger to the bank in a car driven by her mother, Sandra Haines (Haines).

When the group arrived at the bank, Holzinger pulled into the drive-through lane closest to the bank and Haines pulled into the adjacent drive-through lane. Although the sun already had set and a fog was in the air, the area surrounding the night depository was fairly well illuminated. Leaving her car running, Holzinger jumped out of the vehicle and approached the night depository, located around the corner from the drive-through teller windows and an ATM machine. Haines remained in the car with Porto, who was sitting in the front passenger seat, and Haines's two younger daughters, who were in the back seat. None of the women had noticed anyone in the parking lot when they arrived at the bank.

As Holzinger attempted to fit the store's key into the lock on the night depository she realized that something was stuck in the keyhole. Suddenly, a man armed with a gun, later identified as defendant, grabbed Holzinger and demanded the money. Not realizing he had a gun, Holzinger protested. Haines witnessed the altercation, jumped out of her car, and ran up to the assailant. Porto, who also was watching the events unfold, exited the car and ran away from the bank, hoping to find help at a nearby McDonald's restaurant. Realizing Haines was approaching, defendant turned and yelled at Haines to get back in her car and leave. Haines did return to her car but only pulled up a few feet. Once she was about twenty to twenty-five feet from the bank, Porto turned around and made eye contact with defendant before she turned and ran in the opposite direction.

Meanwhile, Holzinger was screaming and pleading with defendant not to harm her. The defendant grabbed the bags of money from Holzinger and then demanded her car keys. Holzinger told defendant the keys were in the car but, before driving away, defendant turned around and shot Holzinger right in the belly.

Hearing the yelling and the gunshot, Porto fell, then got up and began to run back toward the bank. She watched as defendant got into the car and drove away. Fortunately, a nurse was passing by and was able to help Holzinger, who was taken to the hospital and, several months later, delivered a healthy baby boy. Porto and Haines were taken to the police station in separate cars.

Police responded to the scene very quickly and spoke to Holzinger. She described her assailant as a white male in his thirties, approximately five-foot-seven or eight inches tall, with sandy blond hair, wearing a t-shirt and a black hat. Haines described the assailant as about six feet tall, with sandy blond hair and light eyes, wearing a black hat with a logo including the word "Light," and a purplish coat. Porto testified that the assailant was tall, with sandy hair and a husky build, wearing a baseball cap and white sneakers.

A few hours after the incident Holzinger's car was found abandoned around the corner from the bank. A black hat emblazoned with the words "Coors Light" was in the back seat. Of the three bags Holzinger intended to deposit, one was left behind at the bank, one was found in the car, and the third never was recovered. Nearly a year later, Holzinger's wallet was found behind another bank.

On March 8, 1992, the day after the crime, the police went to the home of Haines and Porto and presented Haines with a photo array of six pictures of men matching the description that the women gave the night before. The defendant's picture was not among the choices, and Haines did not choose any of the photographs. Haines then spoke to an artist who sketched defendant's picture based on her memory. Porto looked at the completed drawing and agreed that it looked like the assailant without adding any details.

A few days later, Haines and Porto were asked to look at another photo array consisting of six photographs. The police met with Haines at the police station, where she cautiously chose defendant's photograph. An officer pointed out that since the assailant had been wearing a baseball cap his hair line would have been covered. Haines then put her thumb over the top of the men's heads to simulate the baseball cap and was able to identify defendant with certainty. The police then went to the home Haines and Porto shared and asked Porto to look at the same set of photographs. Both women testified that they did not discuss the photo array during the period of time after Haines made her selection and before Porto viewed the photos. Porto chose the same picture as Haines and conclusively identified defendant as the assailant.

Armed with the photo array, the police approached Holzinger while she was still in the hospital and asked her to identify the assailant. Holzinger chose defendant's photo as well as that of another man, and said she could not be sure which one it was. Holzinger was not permitted to identify defendant at the trial, and the parties were instructed not to mention the photo array that Holzinger was shown at the hospital because it was so inconclusive.

The defendant was arrested on March 11, 1992, in Everett, Massachusetts. He was brought to the Everett police station, where he was booked and put in a cell to await the arrival of the Warwick police.

When the Warwick police arrived they informed defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and proceeded to question him. The defendant denied any involvement in the crime in Warwick.

Subsequently, defendant was sent to prison in Massachusetts for an unrelated crime. Pursuant to the Interstate Agreement on Detainers Act, defendant was brought to Rhode Island in August 1993. The defendant appeared before the court in two separate matters before this case was called. Trial did not get under way until March 1995, after the trial justice heard nearly one hundred pretrial motions brought by the state, defense counsel, and defendant on his own behalf.

On March 10, 1995, a jury returned guilty verdicts on all four counts of the indictment. For the convictions of robbery, assault with a dangerous weapon on Haines and larceny of an automobile, defendant was sentenced to serve consecutive terms of life in prison, twenty years and ten years, respectively. On the count of assault with a dangerous weapon on Holzinger, defendant was convicted as a habitual offender, and twenty-four years and 364 days were added to an underlying sentence of twenty years, all to be served consecutively to the three previous sentences. Pursuant to the habitual offender statute, the trial justice determined that defendant would not be eligible for parole for forty-five years.

On appeal, defendant presents many questions that will be addressed *seriatim.* Additional facts will be supplied as needed.

## II
### Expert Testimony About Eyewitness Identification

Among dozens of other pretrial motions brought on defendant's behalf, defendant requested money to hire an expert to testify about the problems with and unreliability of eyewitness identification.[1] To support his *pro se* motion, defendant submitted the *curriculum vitae* of Dr. Kipling Williams (Dr. Williams). At the pretrial hearing, defense counsel gave a brief summary about the issues Dr. Williams would address. After hearing defendant's arguments, the trial justice concluded that the expert testimony was not necessary and, thus, denied defendant's request for money to retain an expert.

The defendant now argues that the trial justice abused his discretion by denying defendant's motion to present expert testimony on the subject of eyewitness identification. The defendant further contends that, at the very least, the trial justice should have held an evidentiary hearing on the matter before denying his motion.

■ Rule 702 of the Rhode Island Rules of Evidence permits "a witness qualified as an expert by knowledge, skill, experience, training, or education" pertaining to "scientific, technical, or other specialized knowledge," to testify at a trial if it "will

---

1. The defendant brought this motion on two separate occasions. First, on August 12, 1994, defendant relied on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), asserting that his proposed expert would testify about the effect that stress and chaos have on a witness's memory. The hearing justice held the matter so he could consider whether *Daubert* would require that such expert testimony be permitted. When the matter was next called defendant requested that the motion pass because his proposed expert had passed away and a second expert was ill. Thus, defendant's first motion about eyewitness testimony was left unresolved. We will, therefore, address only defendant's second request to admit testimony from his expert, which was brought just before his trial commenced.

assist the trier of fact to understand the evidence or to determine a fact in issue." The trial justice has sole discretion to qualify a witness as an expert. *State v. Arroyo*, 844 A.2d 163, 167 (R.I.2004). "[T]his Court will not disturb such a finding absent a showing of abuse of discretion." *Id.* We hold that the trial justice did not abuse his discretion, and thus his decision is affirmed.

■■■■　First, we will address whether a trial justice is required to hold an evidentiary hearing when a party seeks to present expert testimony. In *State v. Quattrocchi*, 681 A.2d 879 (R.I.1996), we held that in cases in which the allegations are based on repressed recollection and are affected by post traumatic stress disorder, a "trial justice should exercise a gatekeeping function and hold a preliminary evidentiary hearing outside the presence of the jury in order to determine whether such evidence is reliable and whether the situation is one on [*sic*] which expert testimony is appropriate." *Id.* at 884. Before a trial justice schedules an evidentiary hearing, however, the party seeking to present expert testimony must alert the court to the nature of the evidence to be presented through affidavits or offers of proof. *See DiPetrillo v. Dow Chemical Co.*, 729 A.2d 677, 683 (R.I.1999).

The only information defendant supplied to support his *pro se* motion to allow the testimony of his expert witness was Dr. Williams's *curriculum vitae*. At the hearing, defense counsel argued defendant's motion for expert testimony, vaguely telling the trial justice that expert testimony was required "because of the psychiatric nature of these traumatic events with eyewitnesses, the focus of the particular [witnesses], [the witnesses'] ability to remember, the disturbance as to everything else that happened, * * *" and the unreliability of testimony from an eyewitness who

claims to be certain. After reviewing the appropriate case law, the trial justice denied defendant's request, finding it sufficient that Holzinger, the witness who suffered the most psychological distress, was not permitted to testify about defendant's identity. The trial justice also determined that an expert was not required because common sense tells us that eyewitness testimony is not infallible and that defendant's remaining concerns could be addressed on cross-examination and through jury instructions. We agree.

The so-called offers of proof defendant submitted were not sufficient to alert the trial justice to any specific scientific theories that required explanation by an expert, thus triggering the need for an evidentiary hearing. Nothing in defendant's *pro se* motion or memorandum supporting the motion indicated what the expert's testimony would entail. The only attachment to the memo was a copy of Dr. Williams's *curriculum vitae*, which lists a number of publications, professorships and speaking engagements covering a wide range of subjects in the field of psychology. Likewise, nothing on Dr. Williams's *curriculum vitae* indicated what subjects he would discuss on the stand. The only additional information presented to the trial justice at the pretrial hearing was defense counsel's brief assertion that: (1) an expert was needed to alert the jury to the fact that traumatic events affect memory; (2) an expert could discuss the theory of witness focus—presumably the doctrine of gun focus which causes a witness to focus on the weapon rather than the assailant; (3) a particular individual's ability to remember—although the expert would not have assessed or testified about Haines's or Porto's memory specifically; and (4) a study that found the more confident a witness is on the stand, the more unrelia-

ble is his or her identification of a defendant.

■ The trial justice addressed defendant's arguments and determined that an expert was not required. Without more information in the form of affidavits or offers of proof, the trial justice had no reason to conclude that an evidentiary hearing was necessary because the issues raised easily could be addressed on cross-examination and through jury instructions. The trial justice was not required to prolong unnecessarily the judicial process based on the *curriculum vitae* and a few general statements made by defense counsel, none of which indicated that an expert was required. We conclude, therefore, that a hearing was not necessary, and now consider whether the trial justice abused his discretion by refusing to allow defendant's expert witness to testify.

The defendant cites a number of cases beyond our jurisdiction to support his contention that, in situations in which little evidence is available at trial beyond eyewitness testimony, it is proper for the court to allow an expert to testify as to the potential unreliability of eyewitness testimony. For example, see *People v. McDonald*, 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709 (1984), *State v. DuBray*, 317 Mont. 377, 77 P.3d 247 (2003), and *Nations v. State*, 944 S.W.2d 795 (Tex.Ct.App.1997). We need not look beyond our own jurisdiction, however, because we have ruled upon similar issues before.

This Court previously has addressed the issue before us now. In *State v. Gomes*, 604 A.2d 1249, 1256 (R.I.1992), the defendant sought to present expert testimony that would call into question the reliability of the eyewitness testimony upon which the state's case heavily relied. We held that although the evidence was relevant, the witnesses had observed the crime from different angles and under different de-

grees of stress and such testimony "would lead to confusion of the issues and mislead the jury." *Id.* The same rationale applies here. In *State v. Gardiner*, 636 A.2d 710 (R.I.1994), the trial justice held a hearing to determine whether to admit expert testimony to address many of the same issues the parties now raise on appeal concerning eyewitness identifications. After listening to the expert testify at the hearing, the trial justice excluded the testimony on relevancy grounds. *Id.* at 713. He determined that the issues presented were "within the framework of lay opinion" and that jurors tend to rely more heavily on expert witness testimony. *Id.* Consequently, the trial justice concluded the testimony might mislead the jury and would not be relevant. *Id.* This Court affirmed that decision. *Id.* at 714.

Relying on *Gomes* and *Gardiner*, we hold that the trial justice did not abuse his discretion in finding that, based on the facts of this case, an expert was not needed to testify on the issues defendant raised. Haines and Porto both observed defendant at different angles, under different levels of stress, and conclusively identified him within three days of the crime. Before seeing a photograph of defendant, Haines was able to describe him well enough to allow an artist to sketch defendant's portrait and Haines later selected defendant's photograph from an array of six. Importantly, Haines and Porto did not select a picture from the first photographic array, which did not contain defendant's photograph. This indicates that the police did not pressure them to choose a picture. if there was any doubt about whether a particular picture was of the assailant. Further, there is no evidence that Haines and Porto discussed the photographic array with each other; because they made their identifications separately, they are more trustworthy. Finally, the

expert would have been unable to comment directly on the psychological impact the witnesses felt after observing the crime so his testimony would have done little to help the jury and, more importantly, may have misled the jury.

In addition, the trial justice was careful to exclude any evidence pertaining to Holzinger's identification of defendant because he found her testimony to be unreliable. The defendant had an opportunity to cross-examine Haines about the lighting of the bank at the time of the crime; and question Haines and Porto about the stress each woman was feeling, about how far each woman was from defendant and from what angle she was able to observe him. The defendant was able to fully address during cross-examination each of the issues he brought up when requesting that an expert be permitted to testify. By relying on cross-examination instead of allowing expert testimony, the trial justice avoided any problems associated with a jury giving too much weight to an expert's testimony when that expert has no firsthand knowledge about what the witnesses experienced. *See Gardiner*, 636 A.2d at 714.

Furthermore, the trial justice was careful to address the issues that concerned defendant about eyewitness identification during his jury instructions. The trial justice told the jury:

"Eyewitness identification must be viewed with great caution. We have all read or seen accounts of people who are released from prison and declared innocent because there has been a mistake in identification, and now the real person or some other witnesses have come forward. * * * [I]t is very important you scrutinize the eyewitness identification. Considering the lighting that was available, the emotional impact of the moment, what was happening while this was unfolding, opportunity for observation, identifications given at some later time in telling police officers, the viewing of photographs outside of the courtroom setting, how close in proximity were those views time-wise to the incident, information furnished to the investigators, the artists and so on. Did any of the eyewitnesses, you may ask yourself, at some point not make an identification or tell something about the incident when they were in an appropriate position to do so? Did any of the eyewitnesses engage in conduct at any time at the scene or otherwise after the incident that would indicate that they were not making an accurate identification or could be mistaken? You may also consider the factor of a belief in certainty or positivity, how positive the witnesses conveyed that they are to you, by all of the factors, not just their own declaration. If all that was required was the eyewitness to say that he or she is certain and some police officer says 'That's right, they say they're certain,' we would not need trials. The issue ultimately to be determined by this jury is not resolved because a witness says that she is certain."

The trial justice touched upon all the issues defendant raised when he requested an expert. Specifically, the trial justice addressed the fact that at the time the witnesses observed defendant committing the crime they were under great stress because of what was happening around them; that the jury should consider the events that unfolded after the crime and how that would affect the witnesses' memory; and that a witness on the stand saying that she is certain is not enough to resolve whether the person the eyewitness observed was defendant. Most importantly, the trial justice went beyond the scope of concerns brought to his attention by defendant and said authoritatively that

eyewitness "identification must be viewed with great caution." The trial justice's instructions had much of the same effect on the jury as listening to an expert. Juries give great weight to what a trial justice says, so by alerting the jury to the inherent problems with eyewitness identifications, the jury was sufficiently reminded to use common sense to determine what evidence to believe and what to question. Moreover, as in *Gardiner*, 636 A.2d at 713, the determination of these issues was "within the framework of lay opinion."

On appeal, defendant raises many additional issues related to eyewitness identification such as photo bias and blending, familiarity and repetition, unconscious transfer and assimilation of post-event information, and the physiological effects of stressful situations on one's memory. Although these issues raise interesting questions, they were not presented to the trial justice and thus were not properly preserved for appeal. *State v. Hazard*, 785 A.2d 1111, 1121 (R.I.2001). Therefore, we will save the discussion on these issues for another day.

For the foregoing reasons, we conclude that the trial justice did not abuse his discretion, and affirm his decision to exclude expert testimony about eyewitness identification.

## III

### Admissibility of Results from Polygraph Examination

■ The defendant also appeals the trial justice's denial of his motion requesting money to retain an expert to administer a polygraph examination and then admit the results of the examination at trial. This issue was first addressed in *State v. Dery*, 545 A.2d 1014, 1018 (R.I.1988), in which we held "the introduction of any information regarding polygraph examinations into evidence for any purpose would be likely to mislead the jurors rather than to assist them in the determination of the factual issues involved." The defendant urges this Court to reconsider our categorical exclusion of evidence from polygraph examinations in *Dery* in light of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which recommends a case-by-case analysis for the introduction of expert scientific testimony. We were presented with the same argument in *In re Ordell*, 672 A.2d 457, 459 (R.I.1996) (per curiam), and held that the two cases are wholly consistent. Although we need not address this issue on appeal because it has already been decided, we will explore some of the issues defendant raised on appeal.

■ When confronted with novel scientific evidence, a trial justice must determine whether the evidence is based on ostensibly reliable scientific reasoning and methodology. *DiPetrillo*, 729 A.2d at 690. In *Dery*, 545 A.2d at 1017, this Court reviewed the testimony of two experts before concluding that the "test results of polygraph examinations have not been established as scientifically reliable." In so deciding, Rhode Island followed the majority of jurisdictions, which require the categorical exclusion of polygraph evidence. *United States v. Scheffer*, 523 U.S. 303, 311, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). Although the decision in *Dery* was based in part on the standard enunciated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), this Court determined that polygraph examinations are unreliable and that no evidence existed tying deceit and lying to the physiological reactions measured by a polygraph examination. *Dery*, 545 A.2d at 1017.

The defendant disputes the idea that polygraph examinations are unreliable. He notes that the government routinely

uses polygraph testing in various situations. Thus, defendant infers that the polygraph examinations must be reliable. The defendant's inference is flawed. As the United States Supreme Court in *Scheffer* noted,

> "[g]overnmental use of polygraph tests * * * is primarily in the field of personnel·screening, and to a lesser extent as a tool in criminal and intelligence investigations, but not as evidence at trials. * * * Such limited, out of court uses of polygraph techniques obviously differ in character from, and carry less severe consequences than, the use of polygraphs as evidence in a criminal trial." *Scheffer,* 523 U.S. at 312 n. 8, 118 S.Ct. 1261.

■ The defendant also asserts that the government has received a nonreciprocal evidentiary benefit because the government frequently uses polygraph testing. According to defendant, the trial justice's refusal to allow him to introduce polygraph evidence constitutes a violation of his due process rights. As stated above, however, government use of polygraph testing is confined to out-of-court uses. Therefore, defendant's due process rights have not been violated.

■ The defendant further asserts that continued adherence in this state to a *per se* rule of exclusion would violate his constitutional right to present a defense. The United States Supreme Court in *Scheffer,* 523 U.S. at 307–08, 118 S.Ct. 1261, ruled a *per se* rule excluding evidence from a polygraph examination did not violate a defendant's Sixth Amendment rights. The Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution guarantee a defendant the assistance of counsel, a speedy trial before an impartial jury, the right to testify on one's own behalf or call one's own witnesses and to question the witnesses brought against the defendant. The defendant now alleges that his right to put on a defense has been violated by our *per se* rule excluding evidence of polygraph examinations. This argument fails.

First, a polygraph expert's interpretation of polygraph results is not evidence of the accused's conduct; "[i]t is merely the opinion of a witness with no knowledge about any of the facts surrounding the alleged crime, concerning whether the defendant spoke truthfully or deceptively on another occasion." *Scheffer,* 523 U.S. at 317 n. 13, 118 S.Ct. 1261. Without taking the stand, a defendant does not put his credibility for telling the truth at issue. Furthermore, a *per se* rule does not prevent an accused from introducing factual evidence or testimony about the crime itself nor does it limit his right to cross-examine the witnesses against him. Thus, defendant's constitutional rights were not infringed by the trial justice's failure to allow a polygraph expert to testify. Moreover, at the outset of this case, defendant made it clear that he did not intend to take the stand because of his prior criminal record. This Court consistently has held that a defendant cannot testify through the lips of another, more credible, witness to avoid cross-examination. *State v. Harnois,* 638 A.2d 532, 535–36 (R.I.1994). It would have been improper to admit defendant's version of the events through the testimony of an expert in an attempt to avoid cross-examination.

For the foregoing reasons, we affirm our *per se* rule excluding polygraph evidence because it is wholly consistent with current federal and state case law and does not unconstitutionally abridge defendant's rights.

## IV

### Preservation of Evidence

■ Next, defendant argues that the trial justice erred in denying his motion to

dismiss based on the state's failure to preserve the original surveillance videotape depicting the activity outside the bank on the night of the crime. On March 7, 1992, the bank recorded several hours of footage of the area near the ATM machines. The night depository was around the corner from the ATM machines and was not visible from where the camera was positioned. The Warwick police watched the tape but were unable to see anything relating to the robbery. A copy of the original was then made and provided to defendant and the original was returned to the bank, which recorded over the tape. The copy, as well as the original, was of very poor quality.

■■■ Turning first to defendant's due process contention, we affirm the trial justice's conclusion that the failure of the police to preserve an original surveillance tape did not deprive defendant of his right to a fair trial. "A violation of a criminal defendant's due-process right to a fair trial occurs whenever, upon request by a criminal defendant, the prosecutor intentionally or unintentionally suppresses evidence that has a material bearing on questions of guilt or punishment." *State v. Garcia,* 643 A.2d 180, 184 (R.I.1994). In *Garcia,* we adopted the "tripartite test" established by *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) and *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), "to determine whether a defendant's due process rights have been infringed by the failure of law enforcement personnel to preserve evidence." *Garcia,* 643 A.2d at 185.

"This test requires a defendant to establish that the proposed evidence possesses, first, 'an exculpatory value that was apparent before the evidence was destroyed, and [second, is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' *Trombet-*

*ta,* 467 U.S. at 489[104 S.Ct. 2528] * * *. Third, a defendant also must demonstrate that the failure to preserve the exculpatory evidence amounted to bad faith on the part of the state. *Youngblood,* 488 U.S. at 58[104 S.Ct. 2528] * * *; *Trombetta,* 467 U.S. at 488[104 S.Ct. 2528] * * *." *Garcia,* 643 A.2d at 185.

■■■ Although there is no indication that the original bank surveillance tape would have exonerated defendant or provided evidence with which to cast doubt upon the reliability of the eyewitness identification, defendant maintains that it was still exculpatory. "Exculpatory evidence includes evidence that is favorable to an accused and is material to guilt or punishment." *State v. Roberts,* 841 A.2d 175, 178 (R.I.2003). However, "[t]he possibility that [the evidence] could have exculpated [defendant] if preserved or tested is not enough to satisfy the standard of constitutional materiality in *Trombetta.*" *Youngblood,* 488 U.S. at 56–57 n. *, 109 S.Ct. 333. Additionally, the exculpatory value of the evidence must have been "apparent before the evidence was destroyed." *Trombetta,* 467 U.S. at 489, 104 S.Ct. 2528. Because of the poor quality of the tape and the fact that the video camera was not aimed at the area where the robbery took place, defendant's contention that this evidence could have been exculpatory is pure speculation. Therefore, defendant has failed to meet the first prong of the test to prove that his due process rights have been violated.

The defendant also fails to demonstrate that the alleged exculpatory value was known to the police before the original tape was destroyed, the second prong of the test, which also relates to the third prong, that the police acted in bad faith. *See Garcia,* 643 A.2d at 185. As the *Trombetta* Court noted, "[w]henever potentially exculpatory evidence is perma-

nently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Trombetta*, 467 U.S. at 486, 104 S.Ct. 2528. The defendant argues that a tape showing individuals within the vicinity on the night of the crime had clear evidentiary value, despite the fact that the bank's cameras were not aimed directly at the night depository. The Warwick police viewed the original tape and determined that it did not provide any exculpatory evidence. A police detective testified that even the original videotape was not of good quality, that it was difficult to distinguish anything useful without comparing it to electronic bank records. Furthermore, the bank's cameras were not pointing at the area where the crime took place. While the police absolutely should have kept the original tape, we see no evidence of bad faith and "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58, 109 S.Ct. 333. Accordingly, defendant has failed to demonstrate that the videotape was exculpatory and that the alleged exculpatory value was known to the police before the original was destroyed.

The defendant contends that in addition to showing the "real" perpetrator the videotape may have been useful in impeaching the credibility of Haines, who told the police she thought the assailant had come from the direction of the ATM machines. The defendant reasons that if she was wrong about which angle the perpetrator came from, she also might have been wrong about her identification of defendant as the assailant. At trial, Haines testified that she was unsure where defendant had come from but told the police she assumed he must have come from behind the cars, the direction of the ATM machines. The defendant was given ample opportunity to cross-examine Haines about any inconsistencies. Thus, even without the use of the tape, defendant was not deprived of his ability to impeach Haines's credibility by using her previous statement. Consequently, destruction of the original tape did not harm defendant's ability to impeach Haines.

■ Finally, defendant alleges on appeal that the Warwick police acted in bad faith in failing to either retain the original surveillance tape or instruct the bank to preserve it. Looking to § 12–5–7[2] and G.L.1956 § 12–17–6,[3] defendant asserts that the police had a duty to preserve the original bank tape until the end of trial, and that failing to do so constituted bad faith. There is no doubt that the Warwick police should have kept the original videotape intact until the end of the trial. Failure to fulfill this duty, however, did not amount to bad faith. Bad faith destruction of evidence occurs when the police know it "could form a basis for exonerating the defendant" but destroy the evidence anyway. *Youngblood*, 488 U.S. at 58, 109 S.Ct. 333. The police determined that the surveillance tape was of limited utility be-

**2.** General Laws 1956 § 12–5–7 is entitled "Disposition of seized property" and provides, in relevant part, "property seized shall be safely kept by the officer seizing it, under the direction of the court, so long as may be necessary for the purpose of being used as evidence in any case."

**3.** General Laws 1956 § 12–17–6, entitled "Control and disposition of property used as evidence," states that "[a]ll property * * * taken or detained as evidence in any criminal cause shall be subject to the order of the court before which the indictment, information, or complaint shall be brought or pending, and shall, at the termination of the cause, be restored to the rightful owner."

cause of its poor quality and the angle of the camera. In essence, the tape here was destroyed because of sloppy police work. There is no indication of bad faith, and defendant's argument, therefore, fails. We conclude that defendant's due process rights were not violated by the destruction of the original surveillance tape and that the trial justice's decision denying defendant's motion to dismiss was proper.

## V

### The State's Closing Statements

■ The defendant next argues that the trial justice committed reversible error by overruling defendant's objection and allowing the state to conduct a time experiment during its closing statements. While addressing the jury at the end of the trial, the state commented, in response to Porto's testimony that she had observed defendant for twenty seconds during the commission of the crime, on how long twenty seconds really is. The state then proposed that each juror focus on someone else in the courtroom for twenty seconds, until the prosecutor told them time was up (twenty-second experiment). The defendant promptly objected to such a demonstration, but the trial justice overruled the objection and the state proceeded.

The following day, the trial justice told the parties that he realized he should not have allowed the experiment. He remedied the situation in his instructions to the jury, stating: "The [twenty-second experiment] is really not a factor to be considered because the conditions cannot be repeated of the weather, the excitement, the confusion that we've heard about which was going on on the evening of March 7th." Both parties objected to these instructions.

The state contended that the trial justice went too far in specifically referring to the weather, excitement and confusion on the evening in question because such statements would be viewed as specific comments about the evidence, which trial justices are not permitted to make. The defendant, in turn, objected to the instructions on the twenty-second experiment, arguing that the trial justice had not gone far enough and should have told the jury to disregard the experiment entirely.

On March 10, 1995, defendant filed a *pro se* motion to declare a mistrial because of improprieties in the state's closing statement, including the twenty-second experiment. We are of the opinion that the trial justice did not act improperly in allowing the state to perform the twenty-second experiment and that even if that ruling were improper, the trial justice cured any problem in his instructions to the jury.

■ " '[T]here is no precise formula to delineate the proper bounds of the prosecutor's argument to the jury.' " *State v. Harding*, 740 A.2d 1270, 1274 (R.I.1999) (per curiam). A prosecutor is " 'allowed considerable latitude in [closing] argument[s], however, as long as [he or she] stays within the evidence and * * * legitimate inferences * * *.' " *Id.* In considering whether a challenged remark is prejudicial, the trial justice must determine whether the " 'improper comment was so flagrantly impermissible that even a precautionary instruction would have been insufficient to dispel the prejudice in the jurors' minds and to assure defendant a fair and impartial trial.' " *State v. Hernandez*, 641 A.2d 62, 69 (R.I.1994). It is within a trial justice's discretion whether to pass a case, and this Court will only disturb that ruling if it was clearly wrong. *State v. Donato*, 592 A.2d 140, 143 (R.I. 1991).

In challenging the twenty-second experiment, defendant relied on *State v. Wiley*, 567 A.2d 802, 805 (R.I.1989), in which we

held that the trial justice abused his discretion when he allowed a similar timed test, in part because the conditions in the courtroom were so different from the conditions at the time the witness had observed her assailant. The facts before us are substantially different from the facts in *Wiley*. In *Wiley*, the trial justice, not the state, introduced the timed test while the victim was on the stand. The victim testified that she had observed her assailant for only two to five seconds. After the victim completed her testimony, the trial justice asked her to participate in an experiment where he would start timing her and she would say "stop" when she felt that the same amount of time had elapsed as the night of the crime. The trial justice calculated fifteen seconds for the first try and eighteen or nineteen seconds for the second test.[4] *Id.* at 803. In addition to finding that the test was inappropriate because of the difference in circumstances, we held that the trial justice acted improperly in giving his opinion as to how long the eyewitness viewed her attacker, a "cornerstone" issue. *Id.* at 805.

■ This case differs from *Wiley* in several important respects. First, the state, and not the trial justice, performed the experiment. Therefore, the jury could glean no opinion given by the trial justice about the length of time that passed. Second, whether Porto had viewed the assailant for twenty seconds was not an issue. Evidence already had been presented, through Porto's own testimony, that she had observed defendant for twenty seconds from about twenty feet away. Third, the twenty-second experiment was not submitted as evidence. It is well established that in closing arguments the state is not permitted to present evidence, *see Harding*, 740 A.2d at 1274, and the trial

justice alerted the jury to that rule before closing arguments began. Therefore, the twenty-second experiment was proper.

■ We recognize that the conditions in the courtroom were quite different from those on May 7, 1992. *See Wiley*, 567 A.2d at 805. However, the trial justice sufficiently dispelled any prejudice with his cautionary instruction to the jury. *Hernandez*, 641 A.2d at 69. During the jury instructions, the trial justice specifically addressed the fact that the weather, the excitement, and the confusion were unique to that evening and, therefore, "how long is twenty seconds is really not a factor to be considered * * *." Therefore, even if the twenty-second experiment were improper, and we conclude that it was not, the trial justice ensured that defendant suffered no harm through his cautionary instructions to the jury.

## VI

### Defendant's Habitual Offender Status

■ The defendant asserts, and the state concedes, that the trial justice erred on procedural grounds in applying habitual offender status, pursuant to § 12–19–21, thereby adding twenty-four years and 364 days to defendant's already lengthy sentence. We hold that because the state failed to provide defendant notice of its intention to pursue habitual offender status within the time required by statute, the trial justice's decision in applying habitual offender status must be reversed and the additional sentence vacated.

Section 12–19–21(b) provides in pertinent part that:

"Whenever it appears a person shall be deemed a 'habitual criminal,' the attorney general, within forty-five (45)

---

4. Interestingly, the state counted six and a half seconds on the second test while the

defense counsel calculated only three seconds.

days of the arraignment, but in no case later than the date of the pretrial conference, may file with the court a notice specifying that the defendant, upon conviction, is subject to the imposition of an additional sentence in accordance with this section * * *."

The state conceded both at the sentencing hearing and again on appeal that the state had not provided notice to defendant that it would proceed under § 12–19–21. The trial justice initiated the discussion about habitual offender status himself after the jury had convicted defendant on four counts. Because the Legislature's intent is clear under § 12–19–21, we are bound to reverse the trial justice's decision to treat defendant as a habitual offender. We must vacate, therefore, the additional twenty-four years and 364 days, as well as the trial justice's decision to make defendant ineligible for parole until the last day of that enhanced sentence. Fortunately, nothing requires us to alter the underlying sentence of twenty years for committing assault against Holzinger, or the life sentence imposed for robbery, or the twenty years imposed for assault against Haines, or the ten years imposed for stealing Holzinger's car, which all run consecutively. Because this issue is reversed on procedural grounds, we need not address the merits of defendant's arguments, but save those questions for another day.

## VII

### Interstate Agreement on Detainers Act

■ As defendant concedes, his appeal based on the Interstate Agreement on Detainers Act (act), found at G.L.1956 § 13–13–2, is barred by our decisions in *State v. Werner*, 830 A.2d 1107 (R.I.2003)(*Werner II*) and *State v. Werner*, 831 A.2d 183 (R.I.2003)(*Werner I*).[5]

The defendant was arrested on March 11, 1992, in Everett, Massachusetts. Thereafter, defendant stood trial for a separate crime in Massachusetts, where he was convicted and sentenced to prison. On April 1, 1993, the Rhode Island Attorney General sent a letter to the director of the Massachusetts Correctional Institution in Concord pursuant to the act lodging a detainer against defendant. Attached to the letter were indictments/informations for three separate crimes, K1/90–804, K2/88–490 and the case now on appeal, K1/92–875. The defendant then was taken to Rhode Island on August 8, 1993. At roughly the same time this matter was brought to trial in March 1995, defendant went to trial, was convicted and appealed the decisions stemming from the other two indictments. *See Werner I* and *Werner II*, both *supra*.

The defendant now contends, as he did in *Werner I* and *Werner II*, that the state failed to have him transported from Massachusetts to Rhode Island within the time prescribed by the act. In *Werner I*, 831 A.2d at 195, we held that the delay in bringing defendant to trial in Rhode Island was attributable mostly to defendant, who used various tactics in dismissing his attorneys and frustrating his return to Rhode Island. In *Werner II*, 830 A.2d at 1110, we relied on the same facts as in *Werner I* and reached the same outcome. Because the issues before us now are identical to those in *Werner I* and *Werner II*, and Werner was a party in all three cases, and final judgment was reached in *Werner I* and *Werner II*, defendant is barred by collateral estoppel from bringing this claim. *See State v. Pacheco*, 763 A.2d 971, 980 (R.I.2001). Therefore, as defendant

**5.** Although this Court issued a decision in *Werner I* on June 5, 2003, and *Werner II* on June 11, 2003, *Werner II* is reported in an earlier volume of the Atlantic Reporter.

concedes, our previous holdings are controlling and the trial justice's denial of defendant's request to dismiss under the act is affirmed.

## VIII

### Miscellaneous Matters Addressed in Defendant's Supplemental, *Pro Se* Brief

This Court granted defendant leave to submit a supplemental, *pro se* brief in which he raised additional issues that will be addressed now.[6]

### A

### Denial of Motion for Judgment of Acquittal

■ The defendant argues that the evidence presented against him to prove that he stole Holzinger's car was not legally sufficient to sustain a conviction and that the trial justice erred in denying his motion for judgment of acquittal. The defendant contends that because there was no proof offered for the value of the victim's car, the state failed to prove all the elements of that crime beyond a reasonable doubt and thus his due process rights under the Fourteenth Amendment to the United States Constitution were violated.

■ "When reviewing the denial of a motion for judgment of acquittal, this Court applies the same standard as the trial justice." *State v. Brown*, 798 A.2d 942, 950 (R.I.2002). "In ruling on this motion, the trial justice 'must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, and must draw therefrom all reasonable inferences consistent with guilt.'" *Id.* "Viewing the evidence in this light, if the evidence could sustain a guilty verdict by the jury, the trial justice should deny the motion." *State v. Clifton*, 777 A.2d 1272, 1276–77 (R.I.2001).

Contrary to defendant's assertion, evidence of the car's value was presented at trial. Although Holzinger testified that she did not know the exact value of the car, she noted that it was a "new" Honda Prelude, no more than a few years old in 1992. Additionally, photographs of the car were presented as evidence. In light of the factual circumstances in this case, the evidence concerning the value of the car, when viewed most favorably to the state, satisfied the "over $500" element of the crime charged and defendant's argument fails.

### B

### Defendant's Right to have Evidence Independently Tested

■ The defendant also argues that he was denied a constitutional right to compel a "genetic witness" to prove that someone else committed the crime. Essentially defendant alleges that he was denied the opportunity to have a hair sample independently tested for DNA evidence by his own expert. The relevant facts are as follows.

When the police found Holzinger's car there was a black hat on the back seat that had the words "Coors Light" on it, similar to the hat the assailant wore. When the police seized the hat they found a hair stuck to the inside of it. The hair was taken to an expert employed by the state who conducted a microscopic test comparing the unknown sample to samples taken directly from defendant's head. The expert concluded that the known and

---

**6.** The defendant submitted the first volume of a brief within the time permitted, as well as an additional volume several days later. We will not address the issues raised in the second brief because defendant had not been granted permission to submit it.

unknown samples came from the same genetic grouping but could not conclusively determine whether they came from the same person. After hearing testimony from the state's expert, the trial justice determined that the conclusion was unreliable and inadmissible.

The defendant asserts that he filed several motions from 1992 to 1995 to have the sample, as well as another sample found in the hat while at the state's lab, tested by an independent expert to prove that the hair was not his. According to defendant, each of these motions was denied. After scouring the record, we conclude that defendant is mistaken. Many of the motions defendant now claims were filed are not on the record, and defendant misrepresents the nature of some of the motions and what the trial justice actually decided. After examining the record, we conclude that defendant had ample opportunity to have the hair tested by his own expert at the state's expense. As the following discussion demonstrates, the trial justice never improperly denied any of defendant's numerous motions and, therefore, we affirm all the trial justice's rulings on this matter.

First, defendant claims he filed motions for production of the hair samples for independent examination on May 3 and 18, 1994, and that those motions were dismissed on "May 11 and 18, 1992 [sic]." The defendant also claims he filed a petition for writ of habeas corpus on May 28, 1994. However, nothing on the record indicates that these motions ever were filed. Second, there is record of a writ of mandamus filed on February 28, 1995, requesting that the state be compelled to take the sample to the Federal Bureau of Investigations (FBI) for testing. That petition was denied the next day because the trial justice concluded that a writ of mandamus is granted only when the state is "refusing to perform a nondiscretionary ministerial act." Taking the hair sample to the FBI for additional testing, the trial justice determined, clearly is a discretionary act. In addition, in the days leading up to the trial, defendant filed a motion to compel and a motion for funds to hire an expert, which the trial justice determined was the proper avenue to request that another party examine the hair samples. The defendant was never prevented from retaining an independent expert to evaluate the hair sample. In fact, the record indicates the samples were examined by an expert in Boston that defendant had retained.

On August 12, 1994, defendant requested that the state bring the hair samples to his expert in Boston to determine whether the samples could be tested. The trial justice and the parties agreed that the Warwick police would bring the samples to the lab in Boston to be tested so the evidence would never leave the state's possession. Thereafter, on September 2, 1994, the state returned to court and asked whether defendant's expert could come to the lab in Rhode Island to view the samples because that would be more convenient for the state. The defendant objected and the trial justice agreed with defendant that the samples would be brought to his expert, as agreed.

Apparently the samples were brought to a lab in Boston, but what occurred next is unclear. According to defense counsel, the expert examined the samples but, by the time the case was brought to trial, defendant apparently had retained a new expert and there was no further mention of his expert from Boston. At another pretrial hearing, defense counsel informed the court that his new expert had not looked at the sample yet. On March 6, 1995, the fifth day of pretrial hearings, defendant objected to the state's expert testifying about his results from the tests performed

on the hair. At that time the trial justice reminded defendant that, once his own expert conducted the tests, defendant would be able to present those findings at the *voir dire* hearing as well. It is unclear why defendant's expert did not testify at *voir dire*. Regardless of whether defendant's expert ever conducted tests on the hair, the trial justice determined that the results of the test performed by the state's expert were inconclusive, and the jury never heard about samples found in the hat.

Because the trial justice never prevented defendant from presenting his own expert, defendant's right to present a "genetic witness" simply was not violated, as defendant now claims.

## Conclusions

For the reasons discussed above, we affirm the defendant's convictions, and affirm in part and reverse in part the sentence imposed by the trial justice. Although the defendant raises several interesting issues, we are not persuaded that the trial justice committed reversible error in any of his rulings. We reverse only the application of habitual offender status because, although it is clear that defendant is a career criminal, the state failed to put defendant on notice of its intent to pursue habitual offender status and the trial justice erred in enhancing the defendant's sentence.

For the reasons stated herein, we affirm in part and reverse in part the judgment of the Superior Court. The record shall be remanded to the Superior Court.

Justice GOLDBERG and Justice FLAHERTY did not participate.