**STATE**

**v.**

**Manuel PABLO.**

**No. 2006–59–C.A.**

Supreme Court of Rhode Island.

June 14, 2007.

Aaron L. Weisman, Esq., Providence, for Plaintiff.

Paula Rosin, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

In August 2003, two violent sexual assaults occurring only one day apart in the City of Warwick prompted an intricate investigation ultimately resulting in the indictment and conviction of the defendant, Manuel Pablo (defendant), for, *inter alia*, multiple counts of first-degree sexual assault committed against two women and one count of kidnapping committed against one victim. This case is before this Court on the defendant's appeal from that conviction. The defendant argues that (1) his conviction for kidnapping cannot stand because the kidnapping was merely incidental to the sexual assault, and (2) the denial of his motion for a new trial was error. For the reasons set forth in this opinion, we affirm the judgment of conviction.

### I

#### Facts and Travel

##### A

##### Victim One

On the evening of August 8, 2003, a Shaw's supermarket employee was collecting carriages at its Warwick Avenue store in Warwick when Mary Smith,[1] dressed in ripped, soiled clothing, ran barefoot into the parking lot and asked him to call his manager. She told the employee she had just been raped and needed to telephone the police.

---

1. "Mary Smith" is not the victim's real name.

Sergeant Michael Gilbert (Sgt. Gilbert) of the Warwick Police Department was among the police officers who responded to the supermarket. Sergeant Gilbert testified that Smith informed him that earlier that evening she was walking to her mother's home on Dexter Street in Providence when a car with three males approached her, asking if she had a cigarette lighter. As she volunteered a lighter, the front seat passenger reached out of the open car window, grabbed her by her shirt, tearing it, and asked her to accompany them. When she refused, the backseat passenger stepped out of the car, grabbed her neck, and threw her onto the vehicle's backseat floor.

Smith testified that the men drove her from Providence to a dead-end street in Warwick, where they pulled her out of the car and dragged her to a wooded area. Attempting to ward off her assailants, Smith pulled from her purse a pair of scissors, but her tactic proved futile. The men noticed the scissors, grabbed her by her neck and legs, and slammed her body against the ground, which knocked the scissors from her hand. After the men tore off Smith's clothes, the backseat passenger gripped her neck to restrain her, allowing the driver to penetrate her. Smith testified that she lay on the ground crying as the men took turns raping her. She testified that the driver had raped her three times, the backseat passenger twice, and the frontseat passenger once.

When the men finished, they forced her back into the car, tossed her a beer and her denim pants, and drove away. Seeing her opportunity to flee, Smith jumped out of the car when it stopped at a red light near the Shaw's supermarket and ran to get help.

When the Warwick police arrived, Smith provided them with a general description of where she had been assaulted. Her description led the officers to an area at the end of Gould Avenue in Warwick where it intersected Second Avenue behind Statewide Fence, a local business. There, they found a pair of women's sandals, underwear, and a pair of scissors.

The defendant's version of events, recounted at trial, was markedly different from Smith's testimony and from previous statements defendant had made to police. The defendant testified that on August 8, 2003, he was driving his car with Domingo Castro and Cruz Chajal. According to defendant, Castro was in the front passenger seat, while Chajal sat in the back seat. The defendant testified that he was driving near Elmwood Avenue in Providence when Smith signaled for the car to stop. When he stopped, Smith opened the unlocked back door and spoke with Chajal. According to defendant, Smith voluntarily got into the car. Chajal told Castro that Smith had asked for money in exchange for sex. Castro, in turn, asked defendant to drive them to their workplace. The defendant testified that when they arrived there, his passengers asked him for money to pay Smith. When defendant refused, the two men asked him to leave. According to defendant, he complied and left to put air in his car tires at a nearby gas station. The defendant returned fifteen minutes later and found Castro, Chajal, and Smith at the street's entrance. Smith, visibly upset, turned to defendant, saying: "Open the door. Take me away." Smith tearfully explained she was upset because the men refused to give her money. The defendant testified that he honored Smith's request and drove her to a bus stop. The defendant vehemently denied having sex with Smith that evening.

**B**

**Victim Two**

Just over twenty-four hours later, on August 10, 2003, at about 2:15 a.m., Leo

Morris III was at a friend's wedding on Wingate Avenue in Warwick when he heard screaming emanating from nearby Belmont Park. Deciding to investigate, Morris followed the screams into the dark park, and discovered a woman, whom we will call Ann Jones,[2] lying on her back, naked and bleeding. Leaning down to her side, he noticed a stab wound in her abdomen. Morris immediately called the police from his cellular phone and stayed by Jones's side until they arrived. Minutes later, Officer Tammy Mello responded to Belmont Park, where she found paramedics treating Jones's abdominal stab wound and swollen leg.

Jones testified that on August 9, 2003, she was working as a prostitute in the Elmwood Avenue and Parkis Avenue area in Providence when a car began circling the block, its passengers attempting to pick her up. Jones recognized the driver, a previous customer of hers known as "Manny" (and later identified at trial as defendant). When the car passed her for the fourth time, Jones finally accepted the passengers' solicitation for sex and accompanied defendant and his passenger in the vehicle. Jones thought that the men would take her to Wadsworth Street in Providence, but, instead, they drove to a dark park. Upon their arrival, the men forced Jones out of the car as she desperately tried to fight them off. Jones testified that as she struggled with the passenger, defendant maneuvered around her side and stabbed her in the abdomen. Together, the men then carried Jones to a grassy area where both the passenger and defendant raped her. Jones testified that while the passenger was penetrating her, defendant watched "like it was a TV show." According to Jones, both men ejaculated inside of her during the assaults, after which they abandoned their bleeding

victim in the park. Trying to attract help, Jones ran through the park screaming, but collapsed. It was then that Morris discovered her.

Jones was taken by ambulance to Rhode Island Hospital, where she was examined and treated. A rape kit was completed that evening and included oral, vaginal, and rectal swabs. Subsequent testing on those swabs did not reveal the presence of seminal fluid.

Once again, defendant's version of events at trial differed markedly from Jones's account and from defendant's previous statements. According to defendant, this time Chajal drove to defendant's home with Jones to invite defendant first to a party and then to a club. The defendant agreed to accompany them and got in Chajal's car. Instead of driving to a party, however, Chajal drove to Belmont Park. Upon arriving there, Chajal opened the car door to allow Jones to get out, but she refused and requested money before exiting the vehicle. According to defendant, Chajal never paid Jones money, but took her to a grassy area, where Jones struggled to get away. The defendant said that although he could not see whether the two were engaged in intercourse, he could see Chajal on top of Jones and could hear Jones screaming and asking Chajal to let her go. When defendant attempted to rescue Jones, Chajal asked him to leave. Accordingly, defendant drove Chajal's car to the park entrance. The defendant eventually returned because Chajal had threatened to vandalize defendant's car if defendant abandoned him in the park. The defendant asked Chajal if he was ready to leave, at which point Chajal got up off Jones and climbed into the car. The defendant saw Jones run into the darkness.

**2.** Again, "Ann Jones" is not the victim's real name.

The defendant vehemently denied ever having sex with Jones.

## C

### The Investigation

One week after the reported assaults, Warwick police set up surveillance at both the Belmont Park and Gould Avenue areas. On August 15, 2003, plain clothes officers traveled between the two locations in an unmarked vehicle looking for any suspicious activity. When the officers checked on the Gould Avenue location at approximately 10 p.m., they discovered a vehicle parked near the road's end. There, they found two men and one female, whom they later learned was a prostitute. One of the men told the officers that he was in the area because he worked at Statewide Fence, a nearby business. Sergeant Fredrick R. Pierce, Jr. (Sgt. Pierce) of the Warwick Police Department telephoned the owner of Statewide Fence from the scene and asked whether the two men worked for his business. During this conversation, Sgt. Pierce deduced that the men were not the perpetrators of the above-described assaults, but did discover that a Statewide Fence employee named Manuel Pablo, later identified as defendant, matched the description that Jones had provided to the police.

The next day, Detective Jeffrey Scott McKnight (Det. McKnight) traveled to Statewide Fence to question defendant. In response to Det. McKnight's questioning, defendant showed the detective his car and voluntarily permitted the detective to inspect its interior. In the center console, Det. McKnight found Smith's wallet, which she had lost the night she was attacked.

Based on the similarity of the two women's reports, Warwick police presented Smith with a six-person photo array, from which she identified defendant as her assailant. Jones was also shown a similar array and, like Smith, identified defendant as her assailant.

On November 4, 2003, defendant was indicted on the following charges with respect to Smith: three counts of first-degree sexual assault in violation of G.L.1956 § 11–37–2; and one count of kidnapping in violation of G.L.1956 § 11–26–1. The defendant also was indicted on the following charges with respect to Jones: one count of first-degree sexual assault in violation of § 11–37–2; and one count of assault with a dangerous weapon in violation of G.L.1956 § 11–5–2.[3]

A six-day trial commenced and, at the close of the state's case and again at the close of defendant's case, defendant moved for a judgment of acquittal on the kidnapping charge, arguing that the alleged kidnapping was incidental to the sexual assault. The trial justice denied both motions, and the jury found defendant guilty on all counts. After the verdict, defendant moved for a new trial, but that motion was denied. Accordingly, defendant was sentenced as follows: fifty years, twenty to serve, with thirty years suspended, with probation for each of the three counts of first-degree sexual assault against Smith; fifty years, twenty to serve, with thirty years suspended, with probation for the first-degree sexual assault against Jones; twenty years, ten years to serve, with ten years suspended, with probation for kidnapping Smith; and

---

**3.** The defendant also was indicted on two counts of conspiracy to commit first-degree sexual assault in violation of G.L.1956 § 11–1–6 in connection with both attacks, and one count of first-degree robbery in violation of G.L.1956 § 11–39–1(b) stemming from the assault on Smith. However, the trial court dismissed both conspiracy charges and the robbery charge upon defendant's motion for acquittal.

twenty years, ten years to serve, with ten years suspended, with probation for the assault with a dangerous weapon against Jones. All defendant's sentences were to run concurrently, and no-contact orders were issued. The defendant timely appealed.

## II

## Analysis

### A

### Motion for Judgment of Acquittal

■ The defendant first contends that the trial justice erred by failing to grant his renewed motion for judgment of acquittal and urges this Court to vacate his conviction for kidnapping because Smith's detention was incidental to her sexual assault.

■ This Court, when reviewing the denial of a motion for judgment of acquittal, applies the same standard as the trial justice. *State v. Briggs*, 886 A.2d 735, 760 (R.I.2005) (citing *State v. Werner*, 851 A.2d 1093, 1110 (R.I.2004)). Accordingly, we, like the trial justice, analyze the evidence in the light most favorable to the state, refraining from weighing evidence or assessing the witnesses' credibility, and "mak[ing] all reasonable inferences consistent with guilt." *Id.* (citing *State v. Grayhurst*, 852 A.2d 491, 519–20 (R.I.2004)). The motion should be denied unless the evidence is insufficient to support a guilty verdict beyond a reasonable doubt. *See State v. Mendoza*, 889 A.2d 153, 159 (R.I. 2005).

Rhode Island's kidnapping statute provides:

"Whoever, without lawful authority, forcibly or secretly confines or imprisons another person within this state against his or her will, or forcibly carries or sends another person out of this state, or forcibly seizes or confines or inveigles or kidnaps another person with intent either to cause him or her to be secretly confined or imprisoned within this state against his or her will or to cause him or her to be sent out of this state against his or her will, shall be guilty of a felony and, upon conviction, shall be punished by imprisonment for not more than twenty (20) years." Section 11–26–1(a).

Nevertheless, in *State v. Innis*, 433 A.2d 646, 655 (R.I.1981), this Court held that only those confinements that are not merely incidental to the commission of another crime and have "independent significance" fall within the kidnapping statute. *See also State v. Suero*, 721 A.2d 426, 428 (R.I.1998). We concluded, "any movement of a victim during the course of a crime cannot be punished as a kidnapping unless such movement exceeds that necessary to facilitate the crime at hand." *Innis*, 433 A.2d at 655.

There is no dearth of case law analyzing this issue. *See* Frank J. Wozniak, Annotation, *Seizure or detention for purpose of committing rape, robbery, or other offense as constituting separate crime of kidnapping*, 39 A.L.R.5th 283 (1996) (cataloging cases). Indeed, this Court has had numerous opportunities to consider this doctrine and repeatedly has concluded on similar facts that transporting a victim to a relatively distant location is a crime independently significant from a later-occurring assault. *See, e.g., Suero*, 721 A.2d at 429 (kidnapping was independently significant when the defendant forced a child into his vehicle at knifepoint, drove the child from Providence to Central Falls, watched a lewd video, offered her a glass of milk, and then sexually assaulted her); *In re Dana W.*, 588 A.2d 619, 619, 620 (R.I.1991) (kidnapping was independently significant when the victim was seized and dragged into an apartment where her assailants

sexually assaulted her for four to six hours); *State v. Taylor*, 562 A.2d 445, 457 (R.I.1989) (abducting a child from her home and carrying her over two fences before assaulting her several houses away was "more confinement than necessary to perpetrate the sexual assault").

This Court's decision in *State v. Lambert*, 463 A.2d 1333 (R.I.1983), is strikingly similar to the case at hand. In *Lambert*, a woman was accosted in a Providence parking lot by two armed men, one wielding a screwdriver and the other an ice pick. *Id.* at 1334. The men forced the woman into her own car and drove her to various locations in the City of Providence before robbing and sexually assaulting her. *Id.* at 1340. The entire ordeal lasted no more than an hour. We were persuaded that the crimes had independent significance given that the victim's "confinement lasted longer than necessary, and [her] movement exceeded that necessary to facilitate the crimes of robbery and sexual assault." *Id.*

In the instant case, there can be no question that forcing a woman into a car, throwing her against the vehicle's backseat floor, and traveling in at least three cities before finally taking her to a wooded area, pulling her out of the car, and dragging her into dark woods is both an asportation and a confinement that far exceeds what is necessary to commit a sexual assault. Certainly Smith's movement—across two city lines—cannot be said to be merely incidental to her sexual assault. Transporting her to the dark wooded area in Warwick was not inherent in the sexual assault crime, but, rather, was solely intended to lessen defendant's risk of detection by a passerby. By moving Smith to a concealed location and confining her there, defendant exposed Smith to a greater harm than the sexual assault itself posed. Indeed, defendant's actions made it more difficult for Smith to escape, while simultaneously making his criminal activity less visible. We therefore hold that forcibly seizing a defenseless victim and transporting him or her in the back of a vehicle constitutes the independent crime of kidnapping. The trial justice committed no error in denying defendant's motion for judgment of acquittal on the kidnapping charge.

### B

### New Trial

■ The defendant further argues that the trial justice erred in denying his motion for a new trial on the charge of first-degree sexual assault against Jones. According to defendant, insufficient evidence was presented at trial to prove penetration, an essential element of the crime. Specifically, defendant cites the fact that Jones's rape kit produced no conclusive evidence of sexual assault, despite Jones's allegation that both her assailants ejaculated inside her. According to defendant, the trial justice failed to appreciate that Jones's testimony was "strongly contradicted" by the physical evidence, which revealed that no seminal fluid was found in or on her. The state, however, counters that Jones's testimony about her assailants' ejaculation was not unequivocal. Instead, the state points to Jones's fuzzy recollection on cross-examination with respect to this particular detail.

■ This Court affords great deference to a trial justice's decision on a new-trial motion. We "will not disturb the trial justice's decision unless the trial justice overlooked or misconceived material evidence relating to a critical issue or if the trial justice was otherwise clearly wrong." *State v. Harnois*, 853 A.2d 1249, 1254 (R.I. 2004) (quoting *State v. Nunes*, 788 A.2d 460, 464–65 (R.I.2002)). When deciding a

 

motion for a new trial, a trial justice must act as a thirteenth juror and use his or her independent judgment to evaluate witnesses' credibility and the weight of the evidence. *State v. Luanglath,* 863 A.2d 631, 637 (R.I.2005) (citing *Grayhurst,* 852 A.2d at 520). A new-trial motion should be denied if "the trial justice reaches the same determination as did the jury, or if the justice determines that reasonable minds could have differed in reaching the verdict * * *." *Id.* (quoting *Grayhurst,* 852 A.2d at 520).

 Section 11–37–2 provides, in relevant part:

"A person is guilty of first degree sexual assault if he or she engages in sexual penetration with another person, and if any of the following circumstances exist:

" * * *

"(2) The accused uses force or coercion.

"(3) The accused, through concealment or by the element of surprise, is able to overcome the victim."

As is clearly set forth in the statute, to support a conviction under § 11–37–2, the state must prove that the defendant penetrated his or her victim.

After independently weighing the witnesses' credibility and the evidence presented at trial, the trial justice reached the same conclusion as the jury. The trial justice found the victims' testimony compelling. The trial justice clearly explained, "[t]he Court finds the testimony of the two victims in this matter * * * totally credible. The statements of these two women supplied under oath before this Court and jury were completely believable in every aspect." In light of our deferential review, we cannot conclude that the trial justice erred by believing Jones's own testimony and apparently discounting the absence of evidence that the rape kit produced about

the presence of seminal fluid. We note that absence of seminal fluid certainly is not mutually exclusive with an act of penetration and is a question that rests with the finder of fact.

## Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.